## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| U.S. BANK NATIONAL ASSOCIATION, <br><br> Plaintiff, <br><br> vs. <br><br> JAMES KIRK, DARCY FREDERICKSON, AND JASON BEUMER, <br><br> Defendants. | Civil File No. _____ <br><br><br> **VERIFIED COMPLAINT** |

Plaintiff U.S. Bank National Association ("U.S. Bank"), for its Verified Complaint against Defendants James Kirk ("Kirk"), Darcy Frederickson ("Frederickson"), and Jason Beumer ("Beumer") (collectively, "Defendants"), hereby alleges as follows:

### INTRODUCTION

1.      This is an action for damages and equitable relief based upon Defendants' violations and continued violations of their contractual, statutory, and common law duties owed to U.S. Bank.

2.      Private Wealth Management ("PWM") is a division of U.S. Bank that provides end-to-end wealth management services to customers who have a net worth ranging from approximately $3 million to $75 million. PWM helps its customers build and preserve wealth and use it wisely, as well as supporting the people and causes they care about. Like other customers of U.S. Bank, PWM customers expect that their information will remain confidential and not be disclosed by U.S. Bank to any person not affiliated with U.S. Bank. U.S. Bank has policies, procedures, and agreements in place to protect its (and

its clients') confidential information. In addition, U.S. Bank expects that its confidential and proprietary information, including trade secrets, will not be disclosed to any third person or used in connection with any activity competitive with U.S. Bank.

3.  Defendants were employed by U.S. Bank for periods ranging from 10 to 27 years, including legacy banks. As an express condition of their employment, Kirk, Frederickson, and Beumer each signed a contract agreeing to restrictions on their use and disclosure of any confidential information belonging to U.S. Bank or its customers, and also agreeing not to solicit certain clients of U.S. Bank after the end of their employment. Frederickson signed a contract in 2003 when she became eligible to participate in the U.S. Bancorp Stock Incentive Program.

4.  When Defendants resigned from U.S. Bank on April 15, 2025, Kirk was employed as a Private Wealth Advisor, Frederickson was employed as a Wealth Strategist, and Beumer was employed as a Managing Director at PWM's location in Minneapolis, Minnesota. During their employment at U.S. Bank, Defendants were the face of U.S. Bank to many important PWM customer relationships and received access to U.S. Bank trade secrets, including confidential information about those relationships. In addition, U.S. Bank encouraged Defendants to use U.S. Bank resources—and they did use U.S. Bank resources—to foster relationships with these customers by providing them superior service and otherwise by fostering, growing, and deepening the customer's relationships with U.S. Bank.

5.  Defendants each worked primarily with PWM customers with a net worth of approximately $10 million to $75 million each, while some of the customers Defendants

served had a net worth well in excess of $75 million. Collectively, Defendants serviced U.S. Bank relationships worth over $4 billion in assets under management at the time they resigned.

6.     Defendants had access to confidential information including, but not limited to: (1) confidential client information such as client contact information, center of influence contact information, prospect contact information, assets under management, accounts, notes on meetings and client interactions, integrated information from banking and trust systems, and marketing resources; (2) securities information such as the total assets of a client, including those not under management, the performance of accounts, ticklers, account contacts, and interested parties; (3) the fee each respective client is paying; (4) goals-based and cash flow-based planning tools, externally linked accounts of clients' aggregated outside assets, and client personal financial goals; (5) client trust documents and estate plans; and (6) other estate planning, financial, and tax information that clients or their outside advisors shared with Defendants or other client team members for financial planning conversations.

7.     In addition, Kirk had access to the banking mainframe, including but not limited to nearly all U.S. Bank customers' deposit and credit accounts, account remarks, transactions, and the banking image system.

8.     On April 15, 2025, Defendants submitted nearly identical letters of resignation to U.S. Bank. The letters announced Defendants were resigning effective immediately, that they conducted themselves in accordance with the terms of their employment, and that any questions may be directed to their shared attorney. True and

correct copies of the resignation letters submitted by Defendants are attached hereto as **Exhibit A–C**.

9.      On the same day as Defendants' resignations, RBC Wealth Management facilitated the publication of an online article regarding Kirk's departure from U.S. Bank.[1] The article states that Kirk was joining RBC Wealth Management "with more than $1 billion in assets under management"—despite having resigned from U.S. Bank that very day—and quotes two of RBC Wealth Management's senior directors. Similar articles were published in the following days that touted the ten-figure portfolio that Kirk had already brought to RBC Wealth Management.[2]

10.     On April 15, 2025, Defendants called their direct managers to inform them of Defendants' resignations. When Frederickson called her direct manager, Dan Farley, Mr. Farley reminded her of her restrictive covenants. Kirk and Beumer left voicemails for their direct managers. Heather Patrek was Kirk's direct manager and she returned his call, but he did not answer and did not return her call. Defendants access to U.S. Bank's system was shut off shortly after their resignations were submitted.

---

[1] *See* Advisor Magazine, *Jim Kirk Joins RBC Wealth Management in Minneapolis*, https://www.lifehealth.com/people/jim-kirk-joins-rbc-wealth-management-in-minneapolis/ (Apr. 15, 2025).

[2] *See, e.g.*, Mergers & Acquisitions, *RBC Wealth Management Adds Jim Kirk*, https://www.themiddlemarket.com/latest-news/rbc-wealth-management-adds-jim-kirk (Apr. 16, 2025); Family Wealth Report, *Who's Moving Where in Wealth Management? – RBC Wealth Management, Advisory Services Network, Others*, https://www.familywealthreport.com/article.php/Who%E2%80%99s-Moving-Where-In-Wealth-Management%3F-%E2%80%93-RBC%C2%A0Wealth-Management%2C-Advisory-Services-Network%2C-Others?id=204200 (Apr. 17, 2025).

11.     On April 17, 2025, U.S. Bank sent a letter to Defendants' counsel, reminding them of their contractual and legal obligations and demanding that Defendants comply with those obligations. The letter informed Defendants that U.S. Bank had discovered that Defendants were engaged in conduct that appeared to violate their contractual obligations to U.S. Bank, and that U.S. Bank would pursue legal action if they did not cease and desist any further violations immediately. The letter also required written confirmation that Defendants would cease any and all conduct in violation of her contractual obligations by close of business on April 18, 2025. The letter noted that U.S. Bank's investigation was continuing, and U.S. Bank reserved all rights. Finally, the letter also requested the passcodes for each Defendant's company-owned cell phone. A true and correct copy of the letter sent to Defendants' counsel is attached hereto as **Exhibit D**.

12.     On April 21, 2025, Defendants' counsel sent an email to U.S. Bank agreeing to provide the requested passcodes and claiming that the Defendants were in compliance with their obligations to U.S. Bank. Defendants' counsel further claimed that Defendants "deleted all US Bank client info from their phones before they joined RBC." Defendants' counsel's email did not address the serious allegations that Defendants had been actively soliciting U.S. Bank customers in violation of their agreements, nor did it explain how Defendants could have contacted customers if they had deleted all client information from their phones as their counsel claimed. A true and correct copy of the email is attached hereto as **Exhibit E**. Based upon information collected by U.S. Bank, the statement from Defendants' counsel that Defendants "are complying with their obligations owed to US Bank, they do not have any confidential US Bank information, and they deleted all US

Bank client info from their phones before they joined RBC" is false, and did not fully answer the question of whether Defendants have solicited or induced clients to terminate their relationships with U.S. Bank.

13.     Notwithstanding the representations from Defendants' counsel, U.S. Bank has learned that Defendants have violated their contractual obligations to U.S. Bank.

14.     U.S. Bank has endeavored to personally contact every customer that worked with any of the three Defendants to provide these customers with information about who will handle their account going forward and to answer any questions the customers may have about their accounts. Because Defendants worked with so many customers, these efforts are ongoing.

15.     Based upon U.S. Bank's initial investigation, Defendants have aggressively pursued current U.S. Bank customers since their departures—including on or about the day of their resignations—contacting numerous U.S. Bank customers to induce them to leave U.S. Bank or otherwise to solicit their business. In those contacts, among other things, Defendants have encouraged clients to move their accounts away from U.S. Bank. For example, during those discussions, Frederickson has disparaged U.S. Bank, noting the reasons why she left, and warning clients about her alleged discomfort with the direction of U.S. Bank, which she claimed was "bad" for U.S. Bank customers. In addition to being disparaging, these statements are false.

16.     Many of the customers U.S. Bank has contacted have shared that one of the Defendants contacted them on or after April 15, 2025. To date, 24 customers have

6

confirmed that they were contacted by one or more of the Defendants during this timeframe.

17.     For example, one of the customers contacted by Frederickson stated that Frederickson offered to move the client's relationship to RBC Wealth Management and tried to persuade the client to do so by stating that the client's new Portfolio Manager at RBC Wealth Management would be the former boss of their current Portfolio Manager at U.S. Bank.

18.     Another customer confirmed in writing that they were contacted by Kirk on April 18, 2025, and stated that they would be "considering" their "next steps" after that call.

19.     Multiple customers reported that the calls they received from Kirk, Frederickson, and/or Beumer were for the purpose of encouraging the customer to move their business from U.S. Bank to Defendants' new employer, RBC Wealth Management.

20.     There was no legitimate business reason for Defendants to contact any of U.S. Bank's customers on or after April 15, 2025.

21.     The names and contact information of U.S. Bank's customers are not public information; the only way Defendants could have contacted these customers after their resignation would be if Defendants took confidential information with them after they resigned.

22.     At the time they abruptly resigned, Kirk and Beumer both had upcoming meetings on their calendar with one or more customers. When U.S. Bank spoke to one customer who had such a meeting scheduled with Kirk, U.S. Bank asked the customer to

meet with their newly assigned private wealth advisor during the same time they had previously planned to meet with Kirk. The customer declined to meet at that time, stating they had another commitment. The customer later informed U.S. Bank that he signed paperwork to move his relationship to RBC Wealth Management with Kirk and Beumer, and on April 24, 2025 U.S. Bank received an email from RBC Wealth Management inquiring about where to send the transfer paperwork.

23.     U.S. Bank's efforts to speak with each and every one of the customers previously assigned to Defendants is ongoing. For the 24 customers that have verified they were solicited by one or more of the Defendants thus far, these customers account for combined assets under management of nearly $700 million and $4 million in annual revenue.

24.     If even a fraction of these customers move their business from U.S. Bank to RBC Wealth Management as a result of Defendants' solicitation efforts, it will be very difficult to calculate the lost revenue and lost profits that U.S. Bank will experience because variables such as investment growth, contributions, distributions, length of future relationship, and beneficial introductions the client could make to the U.S. Bank team would all contribute to U.S. Bank's losses.

25.     At least one U.S. Bank customer that was solicited by Defendants has informed U.S. Bank that they are moving their business to RBC Wealth Management. **Client A** confirmed to U.S. Bank that they had been contacted by Kirk and Beumer as of April 17, 2025. U.S. Bank made efforts to retain **Client A**'s business, including making prompt introductions to new advisors and offering the client financial incentives. Despite

these efforts, **Client A** informed U.S. Bank on April 25, 2025 that they would be moving their business to RBC Wealth Management to work with Kirk and Beumer.

26.     Defendants have also contacted multiple U.S. Bank employees since their sudden resignations. One current employee told a U.S. Bank representative that Frederickson told him words to the effect of, "Don't worry, we're not going to go after your clients."

27.     Accordingly, having reminded Defendants of their contractual obligations and receiving false and/or misleading representations in response, U.S. Bank is left with no choice but to file its Complaint and to seek emergency injunctive relief.

## PARTIES

28.     Plaintiff U.S. Bank is a national banking association, with its principal place of business in Cincinnati, Ohio. U.S. Bank's corporate headquarters are located in Minneapolis, Minnesota.

29.     Defendant James Kirk is an individual domiciled in Minneapolis, Minnesota.

30.     Defendant Darcy Frederickson is an individual domiciled in Minneapolis, Minnesota.

31.     Defendant Jason Beumer is an individual domiciled in Minneapolis, Minnesota.

## JURISDICTION AND VENUE

32.     This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332(a) because it is an action between citizens of different states and the amount in

controversy exceeds $75,000. Specifically, U.S. Bank is a citizen of Ohio, with its corporate headquarters in Minnesota, and Defendants are citizens of Minnesota.

33.     Under 28 U.S.C. § 1348, national banking associations are citizens of the states where they are located for purposes of all actions against them. The Supreme Court has interpreted this provision to mean that a national banking association is a citizen of the state in which the association has its main office, as set forth in its articles of association. *See Wachovia Bank, Nat'l Ass'n v. Schmidt*, 546 U.S. 303, 318 (2006). As confirmed by the list of active national banks maintained by the U.S. Department of Treasury—Office of the Comptroller of the Currency, U.S. Bank is a national banking association with its main office located in Ohio. *See* Nat'l Banks Active As of 3/31/2025, https://www.occ.treas.gov/topics/charters-and-licensing/financial-institution-lists/national-by-name.pdf.

34.     Venue and jurisdiction are proper in this Court for multiple reasons: (1) Defendants' agreements with U.S. Bank contain Minnesota forum selection and/or choice of law clauses, (2) Defendants attended training either in person and/or virtually in Minnesota, conducted by persons in Minnesota, from U.S. Bank's corporate headquarters in Minnesota, (3) Defendants utilized and logged into U.S. Bank's server located in Minnesota to view client and other confidential and proprietary U.S. Bank information, including its trade secrets, and (4) because the harm was directed, at least in part to Minnesota and this district. Specifically, Defendants Kirk and Beumer [3] agreed that

---

[3]     The agreement between Frederickson and U.S. Bank does not contain a forum selection clause, but contains a Minnesota choice of law provision.

"[v]enue for all disputes between the parties, including those related to this Agreement, shall be with a state or federal court located within Hennepin County, Minnesota." Defendant Frederickson similarly agreed that her "Agreement will be governed by the laws of the State of Minnesota."

## FACTUAL ALLEGATIONS

### I.    Defendants' Employment with and Contractual Obligations to U.S. Bank

35.    U.S. Bank succeeds as a business, in part, because of its valuable relationships and goodwill with its customers and prospective customers. U.S. Bank has successfully developed these important relationships through execution of its strategic vision, including through substantial investments in building and fostering trust with its PWM customers. An important part of building and fostering this trust is U.S. Bank's careful protection of its confidential information, which includes its customers' confidential information and other U.S. Bank trade secrets ("Confidential Information").

36.    U.S. Bank's Confidential Information has been developed by U.S. Bank through significant time and financial investments. It is not readily ascertainable to others by proper means because U.S. Bank has taken numerous steps to protect its secrecy. The Confidential Information derives economic value from the fact that it is not known to others who can obtain economic value from its disclosure. Such information would be exceedingly valuable to a competitor.

37.    U.S. Bank takes reasonable measures to safeguard its Confidential Information and keep such information secret.

38.     For example, U.S. Bank password-protects its computer networks and uses network security to limit various drives on its computer network. Access to U.S. Bank's facilities is restricted to authorized personnel and requires identification and authorization. Access to U.S. Bank's information system facilities is restricted to authorized personnel who possess a unique user identification and password combination. U.S. Bank employees must use keycards to access its offices.

39.     In addition, U.S. Bank communicates to its employees that they must treat certain information, including the Confidential Information at issue in this action, as confidential. In accordance with its standard practice, U.S. Bank communicated that message to Defendants when they became employees of U.S. Bank.

40.     Kirk, Frederickson, and Beumer were employed by U.S. Bank for 10, 27, and 13 years, respectively. When Defendants resigned from U.S. Bank on April 15, 2025, Kirk was employed as a Private Wealth Advisor, Frederickson was employed as a Wealth Strategist, and Beumer was employed as a Managing Director at PWM's location in Minneapolis, Minnesota.

41.     On May 4, 2015, Kirk signed a Confidentiality and Non-Solicitation Agreement with U.S. Bank. A true and correct copy of Kirk's Confidentiality and Non-Solicitation Agreement is attached hereto as **Exhibit F**.

42.     On February 25, 2003, Frederickson signed a Confidentiality and Non-Solicitation Agreement with U.S. Bank. A true and correct copy of Frederickson's Confidentiality and Non-Solicitation Agreement is attached hereto as **Exhibit G**.

43. On October 19, 2012, Beumer signed a Confidentiality and Non-Solicitation Agreement with U.S. Bank. A true and correct copy of Beumer's Confidentiality and Non-Solicitation Agreement is attached hereto as **Exhibit H**.

44. In these Confidentiality and Non-Solicitation Agreements ("NSAs"), Defendants contractually bound themselves, in relevant part, as follows:

> I will treat as confidential all records of U.S. Bank whether in original, duplicated, copied, recorded, computerized or other form, that contain or refer to confidential or proprietary information of U.S. Bank or its customers (collectively "Confidential Information"), including without limitation the following:

> (i)    the names, addresses, and telephone numbers of its customers and prospective customers (collectively "customers"), the investment portfolios of its customers and any information concerning customers' past, present, or future investment activities, any documents or records reflecting work in process, and any information relating to U.S. Bank's customers' banking or trust relationships, customers' income, net worth or other business or personal financial information;

> (ii)   any information concerning U.S. Bank's methods, operations, financing, services, pricing information, compensation data, pending projects and proposals, research and development strategies, production reports, financial and marketing information, technological developments, software, computer systems, techniques, processes, as well as policy or procedure manuals or training materials; and

> (iii)  any other secret or confidential information relating to the products, services, customers, sales, technology and business affairs of U.S. Bank.

(Exs. F–H ¶ 1.)

45. The NSAs further contain a recognition by Defendants that "such Confidential Information constitutes a unique and valuable asset of U.S. Bank acquired at great expense by U.S. Bank and any disclosure or other use of such information other than

for the sole benefit of U.S. Bank would be wrongful and would cause irreparable harm to U.S. Bank." (Exs. F–H ¶ 2.)

46.     The NSAs further provide that, at any time subsequent to Defendants' employment with U.S. Bank, Defendants will not remove Confidential Information from U.S. Bank and "will keep Confidential Information secret and in strict confidence during and subsequent to my employment with U.S. Bank and will not use any such information or disclose, either directly or indirectly, any such information to any person, firm, corporation, association, or other entity," with certain exceptions that are not relevant here.[4] (Exs. F–H ¶ 3.)

47.     The NSAs further include an agreement by Defendants that, for a period of one year after termination of employment, they will not:

> directly or indirectly, on behalf of myself or on behalf of any other individual, association or entity, as an agent or otherwise:
>
> (i)     solicit or induce any of the customers of U.S. Bank for whom I directly performed any services or had any direct business contact, to acquire any product or service that currently is provided or under development by U.S. Bank from any entity other than U.S. Bank; or
>
> (ii)    solicit or induce any of the customers or prospective customers of U.S. Bank, whose identity or other customer specific information I discovered or gained access to as a result of my access to U.S. Bank's Confidential Information, to acquire any product or service that

---

[4] As to the language quoted in Paragraphs 46–48 herein, the Agreement between Frederickson and U.S. Bank contains slightly different wording but is substantively the same.

currently is provided or under development by U.S. Bank from any entity other than U.S. Bank.

(Exs. F, H ¶ 6; Ex. G ¶ 5.) Most, if not all, of the clients Defendants solicited and/or induced in violation of paragraph (ii) were clients whose identity or other specific information Defendants discovered or gained access to as a result of Defendants' access to U.S. Bank's Confidential Information, through its server, located in Minnesota.

48.    In addition, the NSAs provide that for one year following termination of employment, Defendants will not "directly or indirectly, encourage, induce or entice any employee of U.S. Bank to leave U.S. Bank's employment." (Exs. F, H ¶ 7; Ex. G ¶ 6.)

49.    The provisions and restrictions of the NSAs and U.S. Bank's policies are reasonable in scope and duration, and are designed to protect U.S. Bank's legitimate interests in its customer relationships, goodwill, and protection of its Confidential Information. This also includes U.S. Bank's reasonable expectations in the continued goodwill, protecting customer confidential information, and customer relationships, all of which U.S. Bank entrusted to Defendants while they were affiliated with U.S. Bank.

50.    While not imposing undue hardship on Defendants, the NSAs do, in fact, protect U.S. Bank's legitimate interests in guarding its customer information, goodwill, and relationships.

## II.    Defendants' Wrongful Conduct

51.    Defendants each worked as part of U.S. Bank PWM teams until transitioning to RBC Wealth Management, a competing financial services firm. Indeed, after

Defendants' resignations from U.S. Bank, each immediately affiliated with RBC Wealth Management.

52.     Defendants have repeatedly violated their contractual commitments, and have intentionally and wrongfully attempted to interfere with U.S. Bank's business relationships with its valued PWM customers.

53.     U.S. Bank's investigation is ongoing, but already 24 customers have confirmed that they were contacted by one or more of the Defendants during this timeframe.

54.     For example, Kirk and Beumer solicited *Client A* by initiating contact with and/or otherwise encouraging *Client A* to transfer business away from U.S. Bank in violation of each of their NSAs. *Client A* has been a customer of U.S. Bank since 1992, and a client of PWM since 2019. Kirk's and Beumer's efforts to solicit *Client A* began almost immediately after their simultaneous departure from U.S. Bank. *Client A* confirmed to U.S. Bank that they had been contacted by Kirk and Beumer as of April 17, 2025. Despite U.S. Bank's efforts to retain their business, *Client A* informed U.S. Bank on April 25, 2025 that they would be moving their business to RBC Wealth Management to work with Kirk and Beumer.

55.     *Client B* confirmed they were contacted by Frederickson, and stated that Frederickson tried to persuade the client to move their business to RBC Wealth Management. The customer also shared that Frederickson made disparaging comments about U.S. Bank, noting the reasons why she left, and warning about her alleged discomfort with the direction of U.S. Bank, which she claimed was "bad" for U.S. Bank customers.

56.    **Client C** confirmed in writing that they were contacted by Kirk on April 18, 2025, and stated that they would be "considering" their "next steps" after that call.

57.    Multiple customers reported that the calls they received from Kirk, Frederickson, and/or Beumer were for the purpose of encouraging the customer to move their business from U.S. Bank to Defendants' new employer, RBC Wealth Management.

58.    Together, since leaving U.S. Bank on April 15, 2025, Defendants have solicited at least 24 customers, **Clients A-X**, representing nearly $700 million in assets under management and millions of dollars in annual revenue.

59.    Because the identity and contact information of U.S. Bank's customers are not public information, and are in fact expressly identified as Confidential Information as that term is defined in the Agreements, on information and belief, the only way Defendants could have contacted these customers after their resignation would be if Defendants took confidential information with them.

60.    Defendants' wrongful conduct has caused and will cause substantial monetary and irreparable harm to U.S. Bank.

61.    U.S. Bank has suffered irreparable harm and more than $75,000 in damages, including loss of customer goodwill, lost assets under management and lost commissions and other revenue, all as a result of Defendants' wrongful conduct.

## CAUSES OF ACTION

### COUNT I
### (BREACH OF CONTRACT)
### (Against All Defendants)

62.    U.S. Bank realleges the preceding paragraphs as though fully set forth herein.

63.    Defendants' NSAs formed valid and enforceable contracts, and bound the parties to their terms.

64.    The provisions of the NSAs cited above protect U.S. Bank's legitimate business interests as well as the interests of its customers.

65.    As described above, Defendants breached and continue to breach the NSAs by, without limitation:

      a.    soliciting, inducing, or attempting to solicit or induce customers to leave U.S. Bank after terminating her affiliation with U.S. Bank;

      b.    misappropriating U.S. Bank's Confidential Information, including confidential client information;

      c.    using U.S. Bank's Confidential Information to solicit or induce or attempt to solicit customers, divert or direct business away from U.S. Bank, or for other purposes not authorized by U.S. Bank; and

66.    Defendants breach of the NSAs has caused and will continue to cause U.S. Bank monetary damages and irreparable harm, including but not limited to, loss of customer relationships and goodwill and the misappropriation of its Confidential Information.

67.    U.S. Bank has been damaged in an amount to be determined at trial and is entitled to injunctive relief.

## COUNT II
## (TORTIOUS INTERFERENCE WITH BUSINESS EXPECTANCY)
### (Against All Defendants)

68.    U.S. Bank realleges the preceding paragraphs as though fully set forth herein.

69.    U.S. Bank had (and continues to have) a valid expectation of business relationships with its customers, including, but not limited to, **Clients A-X** and any other

customers that Defendants have solicited or induced to transfer their accounts. U.S. Bank had (and continues to have) an expectation that these relationships will provide a future economic benefit as well as a benefit for U.S. Bank clients.

70.     Defendants knew that U.S. Bank had (and continues to have) a valid expectation of business relationships with its customers, including, but not limited to, *Clients A-X* and any other customers that Defendants have contacted since their departure.

71.     But for the conduct of Defendants, U.S. Bank was reasonably certain to have continued its business relationships with its customers, including, but not limited to, *Clients A-X* and any other customers that Defendants have contacted.

72.     Defendants intentionally and wrongfully interfered with U.S. Bank's valid expectation of business relationships, without justification, as described above.

73.     Defendants' interference with U.S. Bank's business expectations has caused and will continue to cause U.S. Bank monetary damages and irreparable harm, including but not limited to, loss of customer relationships and goodwill.

74.     U.S. Bank has been damaged in an amount to be determined at trial and is entitled to injunctive relief.

## COUNT III
### (TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS)
### (Against All Defendants)

75.     U.S. Bank realleges the preceding paragraphs as though fully set forth herein.

76.     U.S. Bank had (and continues to have) valid business relationships with its customers, including, but not limited to, *Clients A-X* and any other customers that Defendants have solicited.

77.    Defendants knew that U.S. Bank had (and continues to have) valid business relationships with its customers, including, but not limited to, *Clients A-X* and other customers that Defendants have contacted in violation of Defendants' NSAs.

78.    Defendants intentionally and wrongfully interfered with U.S. Bank's valid business relationships, without justification, as described above.

79.    Defendants' interference with U.S. Bank's business relationships has caused and will continue to cause U.S. Bank monetary damages and irreparable harm, including but not limited to loss of customer relationships and goodwill.

80.    U.S. Bank has been damaged in an amount to be determined at trial and is entitled to injunctive relief.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, U.S. Bank requests a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, U.S. Bank prays for the following relief:

1.    A Temporary Restraining Order, pending a hearing and ruling on U.S. Bank's request for a preliminary injunction, ordering as follows:

    a.    enjoining Defendants, and all persons in active concert or participation with them (including any persons employed by Defendants), from directly or indirectly engaging in any further business activities which violate Defendants' contracts with U.S. Bank, including but not limited to the solicitation of U.S. Bank customers and the use or disclosure of U.S. Bank Confidential Information.

2.    Compensatory damages, in an amount to be determined at trial;

3.    Attorneys' fees and costs; and

4.    Other relief that the Court may deem appropriate.

Dated: April 30, 2025

**MASLON LLP**

By: *[/s/Melissa Muro LaMere](#)*
     Melissa Muro LaMere (#0393295)
     Jeremy D. F. Krahn (#0399976)
     Carmen-Marie Carballo (#402890)
225 South Sixth Street, Suite 2900
Minneapolis, MN 55402
Telephone: (612) 672-8200
Email:  melissa.murolamere@maslon.com
         jeremy.krahn@maslon.com
         carmen.carballo@maslon.com

**ATTORNEYS FOR PLAINTIFF U.S.
BANK NATIONAL ASSOCIATION**

**VERIFICATION**

I, Heather Day Patrek, declare and affirm under penalty of perjury under the laws of the United States of America that I am a Private Wealth Advisor Managing Director with U.S. Bank National Association and, as such, have personal knowledge that all facts alleged in the foregoing Complaint are true, except those facts that are alleged upon information and belief, which I believe to be true.

This the 30th day of April, 2025.

Heather Day Patrek
Private Wealth Advisor Managing Director
U.S. Bank, National Association

22