**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| U.S. BANK NATIONAL ASSOCIATION,<br><br>Plaintiff,<br>v.<br><br>JAMES KIRK, DARCY FREDERICKSON, AND JASON BEUMER.<br><br>Defendants. | Case No.: ____________<br><br>**DECLARATION OF HEATHER DAY PATREK IN SUPPORT OF PLAINTIFF U.S. BANK NATIONAL ASSOCIATION'S MOTION FOR TEMPORARY RESTRAINING** |

I, Heather Day Patrek, declare as follows:

1. I am a Private Wealth Advisor Managing Director with U.S. Bank National Association. I submit this Declaration in support of Plaintiff's Motion for Temporary Restraining Order. The information in this Declaration is based upon my review of U.S. Bank's business records, publicly available records, and my personal knowledge.

2. Private Wealth Management ("PWM") is a division of U.S. Bank that provides end-to-end wealth management services to customers who have a net worth ranging from approximately $3 million to $75 million. PWM helps its customers build and preserve wealth and use it wisely, as well as supporting the people and causes they care about.

3. Like other customers of U.S. Bank, PWM customers expect that their information will remain confidential and not be disclosed by U.S. Bank to any person not affiliated with U.S. Bank. U.S. Bank has policies, procedures, and agreements in place to

protect its (and its clients') confidential information. In addition, U.S. Bank expects that its confidential and proprietary information, including trade secrets, will not be disclosed to any third person or used in connection with any activity competitive with U.S. Bank.

4. U.S. Bank succeeds as a business, in part, because of its valuable relationships and goodwill with its customers and prospective customers. U.S. Bank has successfully developed these important relationships through execution of its strategic vision, including through substantial investments in building and fostering trust with its PWM customers. An important part of building and fostering this trust is U.S. Bank's careful protection of its confidential information, which includes its customers' confidential information and other U.S. Bank trade secrets ("Confidential Information").

5. U.S. Bank's Confidential Information has been developed by U.S. Bank through significant time and financial investments. It is not readily ascertainable to others by proper means because U.S. Bank has taken numerous steps to protect its secrecy. The Confidential Information derives economic value from the fact that it is not known to others who can obtain economic value from its disclosure. Such information would be exceedingly valuable to a competitor.

6. U.S. Bank takes reasonable measures to safeguard its Confidential Information and keep such information secret.

7. For example, U.S. Bank password-protects its computer networks and uses network security to limit various drives on its computer network. Access to U.S. Bank's facilities is restricted to authorized personnel and requires identification and authorization. Access to U.S. Bank's information system facilities is restricted to authorized personnel

who possess a unique user identification and password combination. U.S. Bank employees must use keycards to access its offices.

8. In addition, U.S. Bank communicates to its employees that they must treat certain information, including the Confidential Information at issue in this action, as confidential. In accordance with its standard practice, U.S. Bank communicated that message to Defendants when they became employees of U.S. Bank.

9. James Kirk ("Kirk"), Darcy Frederickson ("Frederickson"), and Jason Beumer ("Beumer") (collectively, "Defendants") were employed by U.S. Bank for periods ranging from 10 to 27 years, including legacy banks. As an express condition of their employment, Kirk and Beumer each signed a contract agreeing to restrictions on their use and disclosure of any confidential information belonging to U.S. Bank or its clients, and also agreeing not to solicit certain clients of U.S. Bank after the end of their employment. Frederickson signed a substantially similar contract in 2003 when she became eligible to participate in the U.S. Bancorp Stock Incentive Program. Copies of these agreements are attached here as **Exhibits A–C**.

10. When Defendants resigned from U.S. Bank on April 15, 2025, Kirk was employed as a Private Wealth Advisor, Frederickson was employed as a Wealth Strategist, and Beumer was employed as a Managing Director at PWM's location in Minneapolis, Minnesota. During their employment at U.S. Bank, Defendants were the face of U.S. Bank to many important PWM customer relationships and received access to U.S. Bank trade secrets, including confidential information about those relationships. In addition, U.S. Bank encouraged Defendants to use U.S. Bank resources—and they did use U.S. Bank

resources—to foster relationships with these customers by providing them superior service and otherwise by fostering, growing, and deepening the customer's relationships with U.S. Bank.

11. Defendants each worked primarily with PWM customers with a net worth of approximately $10 million to $75 million each, while some of the customers Defendants served had a net worth well in excess of $75 million. Collectively, Defendants serviced U.S. Bank relationships worth over $4 billion in assets under management at the time they resigned.

12. Defendants had access to Confidential Information including, but not limited to: (1) confidential client information such as client contact information, center of influence contact information, prospect contact information, assets under management, accounts, notes on meetings and client interactions, integrated information from banking and trust systems, and marketing resources; (2) securities information such as the total assets of a client, including those not under management, the performance of accounts, ticklers, account contacts, and interested parties; (3) the fee each respective client is paying; (4) goals-based and cash flow-based planning tools, externally linked accounts of clients' aggregated outside assets, and client personal financial goals; (5) client trust documents and estate plans; and (6) other estate planning, financial, and tax information that clients or their outside advisors shared with Defendants or other client team members for financial planning conversations.

13. In addition, Kirk had access to the banking mainframe, including but not limited to nearly all U.S. Bank customers' deposit and credit accounts, account remarks, transactions, and the banking image system.

14. On April 15, 2025, Defendants submitted nearly identical letters of resignation to U.S. Bank. The letters announced Defendants were resigning effective immediately, that they conducted themselves in accordance with the terms of their employment, and that any questions may be directed to their shared attorney. Copies of the resignation letters submitted by Defendants are attached as **Exhibit D–F**.

15. Despite not disclosing the name of their new employer in their resignation letters, it soon became clear that Defendants had each left to work for RBC Wealth Management, a direct competitor of U.S. Bank's. On the same day as Defendants' resignations, an online article regarding Kirk's departure from U.S. Bank and his move to RBC Wealth Management was published.[1] The article states that Kirk was joining RBC Wealth Management "with more than $1 billion in assets under management"—despite having resigned from U.S. Bank that very day—and quotes two of RBC Wealth Management's senior directors. Similar articles were published in the following days that touted the ten-figure portfolio that Kirk had already brought to RBC Wealth Management.[2]

---

[1] *See* Advisor Magazine, *Jim Kirk Joins RBC Wealth Management in Minneapolis*, https://www.lifehealth.com/people/jim-kirk-joins-rbc-wealth-management-in-minneapolis/ (Apr. 15, 2025).

[2] *See, e.g.*, Mergers & Acquisitions, *RBC Wealth Management Adds Jim Kirk*, https://www.themiddlemarket.com/latest-news/rbc-wealth-management-adds-jim-kirk (Apr. 16, 2025); Family Wealth Report, *Who's Moving Where in Wealth Management? – RBC Wealth Management, Advisory Services Network, Others*,

16. On April 15, 2025, Defendants called their direct managers to inform them of Defendants' resignations. When Frederickson called her direct manager, Dan Farley, Mr. Farley reminded her of her restrictive covenants. Kirk and Beumer left voicemails for their direct managers. I was Kirk's direct manager and I returned his call, but he did not answer and did not return my call. Defendants access to U.S. Bank's system was shut off shortly after their resignations were submitted.

17. Based upon U.S. Bank's initial investigation, Defendants have aggressively pursued U.S. Bank customers since their departures, contacting numerous U.S. Bank customers to induce them to leave U.S. Bank or otherwise to solicit their business.

18. U.S. Bank has endeavored to personally contact every customer that worked with any of the three Defendants to provide these customers with information about who will handle their account going forward and to answer any questions the customers may have about their accounts. Because Defendants worked with so many customers, these efforts are ongoing as of the date I am signing this Declaration.

19. Many of the customers U.S. Bank has contacted have shared that one of the Defendants contacted them on or after April 15, 2025. To date, 24 customers have confirmed that they were contacted by one or more of the Defendants during this timeframe.

---

https://www.familywealthreport.com/article.php/Who%E2%80%99s-Moving-Where-In-Wealth-Management%3F-%E2%80%93-RBC%C2%A0Wealth-Management%2C-Advisory-Services-Network%2C-Others?id=204200 (Apr. 17, 2025).

20. For example, one of the customers contacted by Frederickson stated that Frederickson offered to move the client's business to RBC Wealth Management and tried to persuade the client to do so by stating that the client's new Portfolio Manager at RBC Wealth Management would be the former boss of their current Portfolio Manager at U.S. Bank. The customer also shared that Frederickson made disparaging comments about U.S. Bank, noting the reasons why she left, and warning about her alleged discomfort with the direction of U.S. Bank, which she claimed was "bad" for U.S. Bank customers.

21. Another customer confirmed in writing that they were contacted by Kirk on April 18, 2025, and stated that they would be considering their "next steps" after that call.

22. Multiple customers reported that the calls they received from Kirk, Frederickson, and/or Beumer were for the purpose of encouraging the customer to move their business from U.S. Bank to Defendants' new employer, RBC Wealth Management.

23. There was no legitimate business reason for Defendants to contact any of U.S. Bank's customers on or after April 15, 2025.

24. The names and contact information of U.S. Bank's customers are not public information and are specifically identified as Confidential Information in the Agreements Defendants all signed with U.S. Bank. The only way Defendants could have contacted these customers after their resignation would be if Defendants took Confidential Information with them after they resigned.

25. At the time they abruptly resigned, Kirk and Beumer both had upcoming meetings on their calendar with one or more customers. When U.S. Bank spoke to one customer who had such a meeting scheduled with Kirk, U.S. Bank asked the customer to

meet with their newly assigned private wealth advisor during the same time they had previously planned to meet with Kirk. The customer declined to meet at that time, stating they had another commitment. The customer later informed U.S. Bank that he signed paperwork to move his relationship to RBC Wealth Management with Kirk and Beumer, and on April 24, 2025 U.S. Bank received an email from RBC Wealth Management inquiring about where to send the transfer paperwork.

26. U.S. Bank's efforts to speak with each and every one of the customers previously assigned to Defendants is ongoing. For the 24 customers that have verified they were solicited by one or more of the Defendants thus far, these customers account for combined assets under management of nearly $700 million and $4 million in annual revenue.

27. If even a fraction of these customers move their business from U.S. Bank to RBC Wealth Management as a result of Defendants' solicitation efforts, it will be very difficult to calculate the lost revenue and lost profits that U.S. Bank will experience because variables such as investment growth, contributions, distributions, length of future relationship, and beneficial introductions the client could make to the U.S. Bank team would all contribute to U.S. Bank's losses.

28. At least one U.S. Bank customer that was solicited by Defendants has informed U.S. Bank that they are moving their business to RBC Wealth Management. That client—a U.S. Bank customer since 1992, and a client of PWM since 2019—confirmed to U.S. Bank that they had been contacted by Kirk and Beumer as of April 17, 2025. U.S. Bank made efforts to retain that client's business, including making prompt introductions

to new advisors and offering the client financial incentives. Despite these efforts, the client informed U.S. Bank on April 25, 2025, that they would be moving their business to RBC Wealth Management to work with Kirk and Beumer.

29. Defendants have also contacted multiple U.S. Bank employees since their sudden resignations. One current employee told me that Frederickson told him words to the effect of, "Don't worry, we're not going to go after your clients."

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 30th day of April, 2025.

s/ Heather Day Patrek
Heather Day Patrek