**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MINNESOTA**

| | | |
|---|---|---|
| U.S. BANK NATIONAL ASSOCIATION, | : | Civil Action No. 0:25-cv-01926-LMP-DTS |
| *Plaintiff,* | : | |
| v. | : | |
| JAMES KIRK, DARCY FREDERICKSON, and JASON BEUMER, | : | |
| *Defendants.* | : | |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER**

**MOSS & BARNETT**

Craig A. Brandt, Esq.
150 South Fifth Street, Suite 1200
Minneapolis, MN 55402
Tel.: (612) 877-5360
Email: Craig.Brandt@lawmoss.com

**STEVENS & LEE**
A Pennsylvania Professional Corporation

Thomas B. Lewis, Esq. (*pro hac vice* granted)
Jonathan A. Scobie, Esq. (*pro hac vice* granted)
510 Carnegie Center Dr., Suite 400
Princeton, NJ 08540
Tel.: (609) 987-5335
Email: thomas.lewis@stevenslee.com
Email: jonathan.scobie@stevenslee.com

*Attorneys for Defendants*

# TABLE OF CONTENTS

I. PRELIMINARY STATEMENT ........................................................................ 1

II. RELEVANT FACTUAL BACKGROUND.............................................................. 5

III. ARGUMENT ............................................................................................. 5

A. LEGAL STANDARD ..................................................................................... 5

B. U.S. BANK HAS FAILED TO SHOW A REASONABLE LIKELIHOOD OF SUCCESS ON THE MERITS ........................................................................ 6

a. U.S. BANK HAS NOT SUPPORTED ITS MOTION WITH SUFFICIENT EVIDENCE THAT DEFENDANTS VIOLATED THEIR NON-SOLICITATION AGREEMENTS ……………………………………....6

b. U.S. BANK HAS NOT SUPPORTED ITS MOTION WITH SUFFICIENT EVIDENCE THAT DEFENDANTS VIOLATED THEIR CONFIDENTIALITY AGREEMENTS ………………………………...19

C. U.S. BANK HAS NOT SHOWN AND CANNOT SHOW ANY IRREPARABLE HARM ........................................................................ 22

D. THE BALANCE OF THE EQUITIES WEIGHS IN FAVOR OF DEFENDANTS ........................................................................ 25

E. GRANTING AN INJUNCTION WILL NOT SERVE THE PUBLIC INTEREST ........................................................................ 26

F. IF INJUNCTIVE RELIEF IS GRANTED, AN APPROPRIATE ORDER SHOULD BE ENTERED TO BALANCE THE PUBLIC INTEREST AND PROTECT THE CLIENTS ........................................................ 28

III. CONCLUSION........................................................................................ 30

# TABLE OF AUTHORITIES

**CASES**

*Ad Assocs., Inc. v. Coast to Coast Classifieds, Inc.*, No. CIV.04-3418, 2005 WL 3372968, at *5 (D. Minn. Dec. 12, 2005) ........ 21

*Alpha Tax Servs., Inc. v. Stuart*, 761 P.2d 1073, 1075 (Ariz. Ct. App. 1988) ........ 9

*Bank of Am. Inv. Servs., Inc. v. Byrd*, 2:09-CV-211, 2:09-CV-212, 2009 WL 10184606 (E.D. Va. June 15, 2009) ........ 12

*Benfield, Inc. v. Moline*, No. CIV. 04-3513, 2006 WL 452903, at *6 (D. Minn. Feb. 22, 2006) ........ 9

*Bennett v. Storz Broad. Co.*, 270 Minn. 525, 533, 134 N.W.2d 892, 898 (1965) ........ 9

*Cardiovascular Sys., Inc. v. Money*, 980 F. Supp. 2d 1102, 1104 (D. Minn. 2013) ........ 8

*Citibank, N.A., et. al. v. Vahab, et. al.*, Index No. 651795 (NY Sup. March 19, 2021) (attached as Exhibit B) ........ 29

*CDI Energy Servs. v. W. River Pumps, Inc.*, 567 F.3d 398, 402 (8th Cir. 2009) ........ 6

*Dataphase Sys., Inc. v. C.L. Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) ........ 1, 3, 4, 5, 15, 26

*Edward D. Jones & Co., L.P. v. Kerr*, 415 F. Supp. 3d 861, 873 (S.D. Ind. 2019) ........ 1, 11, 19

*Gavaras v. Greenspring Media, LLC*, 994 F. Supp. 2d 1006, 1010 (D. Minn. 2014) ........ 9

*Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009) ........ 23

*Hotchkiss v. Cedar Rapids Cmty. Sch. Dist.*, 115 F.4th 889, 892 (8th Cir. 2024) ........ 6

*ING Life Ins. & Annuity Co. v. Gitterman*, No. 10-4076, 2010 WL 3283526, at *4–5 (D.N.J. Aug. 18, 2010) ........ 11

*Jet Midwest Int'l Co., Ltd v. Jet Midwest Grp.*, LLC, 953 F.3d 1041, 1045 (8th Cir. 2020) ... 6

*J.P. Morgan Sec. LLC v. Logsdon*, No. 3:22-CV-14, 2022 WL 509120 (W.D. Ky. Feb. 18, 2022) ... 17, 18

*J.P. Morgan Sec. LLC v. Shields*, No. 118CV02788, 2018 WL 6426835 (S.D. Ind. Sept. 26, 2018) ... 17

*J.P. Morgan Securities, LLC v. Goldinger*, Index No. 655340 (NY Sup. Sept. 13, 2021) (attached as Exhibit A) ... 29

*J.P. Morgan Securities, LLC v. Sefardi*, Index No. 654352 (NY Sup. Nov. 21, 2022) (attached as Exhibit C) ... 29

*Ketterling v. Hamilton*, No. A05-1872, 2006 WL 2258053, *4 (Minn. Ct. App. Aug. 8, 2006) ... 3

*Lankford v. Sherman*, 451 F.3d 496, 503 (8th Cir. 2006) ... 6

*Life Time Fitness, Inc. v. DeCelles*, 854 F. Supp. 2d 690, 694 (D. Minn. 2012) ... 5

*Mariner Wealth Advisors, LLC v. Savvy Advisors, Inc.*, No. 1:24-CV-351, 2024 WL 3466153, at *8 (S.D. Ohio July 19, 2024) ... 11, 29

*Medtronic, Inc. v. Ernst*, 182 F. Supp. 3d 925, 934 (D. Minn. 2016) ... 23

*Merrill Lynch, Pierce, Fenner & Smith v. Bennert*, 980 F. Supp. 73, 75 (D. Me. 1997) ... 24

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. de Liniere*, 572 F. Supp. 246, 249 (N.D. Ga. 1983) ... 24

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. McCullen*, No. 95-14329-CIV-PAINE, 1995 WL 799537, at *3 (S.D. Fla. Dec. 13, 1995) ... 27

*Mobile Mini, Inc. v. Vevea*, No. CV 17-1684, 2017 WL 3172712, at *6 (D. Minn. July 25, 2017) ... 10

*Moeschler v. Honkamp Krueger Fin. Servs., Inc.*, No. 21-CV-0416 (PJS/DTS), 2021 WL 4273481, at *6 (D. Minn. Sept. 21, 2021) ... 21, 29

*Morgan Stanley DW, Inc. v. Frisby*, 163 F. Supp. 2d 1371, 1375-76 (N.D. Ga. 2001) ... 24, 25, 27

*Northland Ins. Cos. v. Blaylock*, 115 F. Supp. 2d 1108, 1116 (D. Minn. 2000) .......... 22, 25, 26

*Park Nicollet Clinic v. Hamann*, 808 N.W .2d 828, 833 (Minn. 2011) .......... 6

*Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008) (en banc) .......... 6

*Prudential Ins. Co. of Am. v. LaFontain*, No. 24-CV-940, 2024 WL 3802757, at *3 (E.D. Wis. Aug. 9, 2024) .......... 16, 17

*Regions Bank v. Raymond James & Assocs., Inc.*, 2020 WL 6870815, No. 6:20-cv-685-Orl-40EJK (M.D. Fl. May 15, 2020) .......... 12, 24, 26

*Sleep No. Corp. v. Young*, 532 F. Supp. 3d 793,798 (D. Minn. 2021), aff'd, 33 F.4th 1012 (8th Cir. 2022) .......... 6

*Snyder's Drug Stores, Inc. v. Sheehy Props., Inc.*, 266 N.W.2d 882, 885 (Minn. 1978) (per curiam) .......... 8

*UBS Fin. Servs., Inc. v. Christenson*, No. CIV. 13-1081, 2013 WL 2145703, at *5 (D. Minn. May 15, 2013) .......... 1, 6, 9, 19, 27, 29

*UBS Paine Webber Inc. v. Dowd*, No. 015402BLS, 2001 WL 1772856 (Sup. Ct. Mass. July 7, 2004) .......... 12

*Variable Annuity Life Ins. Co. v. Laeng*, 8:12-cv-2280-T-33, 2013 WL 499982, at * 7 (M.D. Fl. Jan. 2, 2013) .......... 27

*Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003) .......... 5, 23

*Wells Fargo Ins. Servs. USA, Inc. v. King*, No. 15-CV-4378, 2016 WL 299013, at *7–8 (D. Minn. Jan. 25, 2016) .......... 3, 21

*Wells Fargo Invs., LLC v. Bengtson*, 2007 WL 2007997, at *1 (D. Minn. July 9, 2007) .......... 10

*Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008) .......... 6

*WSFS Fin. Corp. v. Cobb*, No. 2:22-CV-815, 2023 WL 4552110, at *6-7 (E.D. Pa. July 14, 2023) .......... 11

Defendants James Kirk ("Kirk"), Darcy Frederickson ("Frederickson"), and Jason Beumer ("Beumer") (collectively, "Defendants") respectfully file this Memorandum of Law in Opposition to the Motion for a Temporary Restraining Order ("Motion") filed by Plaintiff U.S. Bank National Association ("Plaintiff" or "U.S. Bank") under Rule 65 of the Federal Rules of Civil Procedure. For reasons set forth below, the Court should deny the Motion because Plaintiff has failed to meet the heavy burden of establishing that the extraordinary remedy of injunctive relief is warranted in this case under *Dataphase Sys., Inc. v. C.L. Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981).

## I. PRELIMINARY STATEMENT

The terms of the U.S. Bank non-solicitation agreements[1] do not prohibit Defendants from contacting their clients to announce a change of employment. Minnesota courts and courts across the country have held that an announcement of a change of employment in the financial services industry does not constitute a solicitation. *See e.g., UBS Fin. Servs., Inc. v. Christenson*, No. CIV. 13-1081 MJD/JSM, 2013 WL 2145703, at *5 (D. Minn. May 15, 2013) (the Court observing that "there is a difference between soliciting and contacting" and finding that an announcement is not an impermissible solicitation); *see also, e.g., Edward D. Jones & Co., L.P. v. Kerr*, 415 F. Supp. 3d 861, 873 (S.D. Ind. 2019) (recognizing that an "announcement does not qualify as a solicitation where there is no evidence to show that [the recently departed advisor] did anything but inform his former clients of his new employment."). The U.S. Bank non-solicitation agreements for each

[1] Attached as Exhibits F, G, and H to the Complaint.

Defendant only prohibit *solicitation* and *inducement* of U.S. Bank's clients; they do not prohibit all forms of contact with these clients. They do not prohibit announcing a change of employment.

U.S. Bank has not offered any evidence that Defendants have done more than contact their clients for the permissible purpose of alerting a change of employment. Defendants have strong, personal relationships with many of their clients, and simply, as a personal and professional courtesy, alerted their clients they are no longer employed at U.S. Bank.

U.S. Bank's motion for injunctive relief is supported only by the Declaration of Heather Day Patrek (hereinafter, the "Patrek Declaration"), which contains conjecture, double hearsay, and conclusory allegations that approximately twenty-four (24) unnamed and unknown clients were "contacted" or "solicited" by Defendants, without describing any facts to support this conclusion. The Patrek Declaration does not identify the name of a single client who was allegedly contacted or solicited; does not identify the U.S. Bank employee who spoke to these clients; does not describe the conversations with these unnamed clients; and does not indicate how Ms. Patrek herself, as the affiant, even became aware of the client's communication. Nowhere in the Patrek Declaration does Ms. Patrek state that she spoke directly to these unnamed clients or that the information in her Declaration was provided to her by the U.S. Bank employee who communicated with these unnamed clients and what was allegedly stated by the client that could lead a fact-finder to

determine that the communication was a solicitation. The Patrek Declaration does not contain credible evidence and is insufficient to obtain an injunction under *Dataphase.*

Furthermore, U.S. Bank has no evidence that Defendants took any confidential documents or records from U.S. Bank. The Patrek Declaration presumes that Defendants retained confidential documents or records simply because Defendants alerted their clients of the departure from U.S. Bank. According to the Patrek Declaration, "[t]he only way Defendants could have contacted these customers after their resignation would be if Defendants took Confidential Information with them after they resigned." (Patrek Decl. ¶ 24). Ms. Patrek is wrong, and offers no evidence that Defendants took any confidential documents, and no evidence that client contact information cannot lawfully be obtained through sources other than U.S. Bank. Further, the U.S. Bank agreements do not prohibit Defendants from alerting clients they are no longer employed.

An injunction is not warranted when the moving party, like U.S. Bank here, has "submitted no evidence to support any of the claims in [their] complaint." *Ketterling v. Hamilton*, No. A05-1872, 2006 WL 2258053, *4 (Minn. Ct. App. Aug. 8, 2006). Instead, U.S. Bank simply assumes that every client alleged to have been in contact with Defendants must have been solicited, and further, that Defendants must have taken confidential information if they were in contact with their clients. This Court rejected a similar conclusory argument made by a plaintiff employer against a former employee in *Wells Fargo Insurance Services USA, Inc. v. King*, No. 15-CV-4378 (PJS/JJK), 2016 WL 299013, at *7–8 (D. Minn. Jan. 25, 2016) (rejecting argument that defendant employee

"must have" used the former employer's confidential information simply because he was "in contact with WFI's customers," finding "no evidence that King has in his possession any documents or other tangible things that contain WFI's trade secrets or confidential information," and "no evidence that King could not have lawfully ascertained the customer names and contact information"). To obtain injunctive relief under *Dataphase*, the law demands more of Plaintiff than speculative allegations.

Because Minnesota law distinguishes an announcement from a prohibited solicitation, *see Christensen*, and the plain terms of the U.S. Bank agreements do not prohibit an announcement, the question before this Court is whether U.S. Bank has offered sufficient proof under *Dataphase* that Defendants went beyond permissibly announcing. The answer is no. U.S. Bank's motion rests on speculation, not fact, which fails to meet the heavy standard for injunctive relief. Furthermore, the balance of the equities favors Defendants, whose reputations have been harmed by U.S. Bank's public filing of speculative allegations and would be further harmed by the entry of an injunction. Finally, given that the public has a right to know that their trusted advisor has joined another firm, and further, that U.S. Bank has no evidence that Defendants did more than alert their clients that they had joined a new firm, granting any injunction against Defendants would not serve the public interest. For these reasons, as discussed fully below, U.S. Bank's motion should be denied.

## II. RELEVANT FACTUAL BACKGROUND

Defendants Kirk, Frederickson, and Beumer incorporate the factual statements set forth in their Declarations submitted in opposition to Plaintiff's Motion. *See* Declaration of James Kirk (hereinafter, "Kirk Declaration"); Declaration of Darcy Frederickson (hereinafter, "Frederickson Declaration"); and Declaration of Jason Beumer (hereinafter, "Beumer Declaration").

As stated in their Declarations, Defendants announced their change of employment, consistent with Minnesota law and the law across the country, and did not solicit or induce their clients in violation of their U.S. Bank agreements. *See* Kirk Declaration, at ¶¶ 5, 6, 9, 14; Frederickson Declaration, at ¶¶ 5, 6, 9, 14; and Beumer Declaration, at ¶¶ 5, 6, 9, 14. Defendants also did not take U.S. Bank's confidential information. *See* Kirk Declaration, at ¶ 8; Frederickson Declaration, at ¶ 8; and Beumer Declaration, at ¶ 8.

## III. ARGUMENT

### A. LEGAL STANDARD

A temporary restraining order ("TRO") "is an extraordinary equitable remedy." *Life Time Fitness, Inc. v. DeCelles*, 854 F. Supp. 2d 690, 694 (D. Minn. 2012) (citing *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003)). "The court considers four factors in determining whether a TRO should issue: (1) the threat of irreparable harm to the movant in the absence of relief, (2) the balance between that harm and the harm that the relief may cause the non-moving party, (3) the likelihood of the movant's ultimate success on the merits and (4) the public interest." *Id.* at 694-95 (citing *Dataphase, supra*, 640 F.2d at 114).

"The party seeking injunctive relief bears the burden of proving these factors." *CDI Energy Servs. v. W. River Pumps, Inc.*, 567 F.3d 398, 402 (8th Cir. 2009) (citing *Lankford v. Sherman*, 451 F.3d 496, 503 (8th Cir. 2006)). "Preliminary injunctive relief is 'an extraordinary remedy that may only be awarded upon a clear showing the plaintiff is entitled to such relief.'" *Hotchkiss v. Cedar Rapids Cmty. Sch. Dist.*, 115 F.4th 889, 892 (8th Cir. 2024) (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008)). U.S. Bank has not met this burden.

## B. U.S. BANK HAS FAILED TO SHOW A REASONABLE LIKELIHOOD OF SUCCESS ON THE MERITS

The "most important" factor in determining whether an injunction should be granted is the likelihood of success on the merits. *Sleep No. Corp. v. Young*, 532 F. Supp. 3d 793,798 (D. Minn. 2021), aff'd, 33 F.4th 1012 (8th Cir. 2022). To obtain injunctive relief, U.S. Bank must show a "fair chance of prevailing." *Jet Midwest Int'l Co., Ltd v. Jet Midwest Grp.*, LLC, 953 F.3d 1041, 1045 (8th Cir. 2020) (quoting *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008) (en banc)).

a. U.S. Bank has not supported its Motion with sufficient evidence that Defendants violated their non-solicitation agreements

U.S. Bank has alleged that Defendants breached their non-solicitation agreement with U.S. Bank.[2] However, the plain language of Defendants' U.S. Bank agreements only

[2] In Minnesota, "[t]o establish a claim of breach of contract, a plaintiff must prove three elements: '(1) formation of a contract, (2) performance by plaintiff of any conditions precedent to his right to demand performance by the defendant, and (3) breach of the contract by defendant." *Park Nicollet Clinic v. Hamann*, 808 N.W .2d 828, 833 (Minn. 2011)).

prohibit them from "solicit[ing] or induc[ing]" their clients. The agreements do not prohibit "contacting" their clients for purposes other than solicitation, such as a lawful *announcement* of a change of employment. *See, e.g., UBS Fin. Servs., Inc. v. Christenson*, No. CIV. 13-1081 MJD/JSM, 2013 WL 2145703, at *5 (D. Minn. May 15, 2013) (distinguishing contacting from soliciting and finding that a neutral announcement of a change of employment is not a solicitation in the financial services industry).

The plain terms of the U.S. Bank agreements also do not impose a blanket prohibition on Defendants communicating with their clients or prohibit Defendants from accepting unsolicited business from their clients. The U.S. Bank non-solicitation agreements for Kirk and Beumer state:

> I agree that during the term of my employment with U.S. Bank, and for a period of one year thereafter, I will not, directly or indirectly, on behalf of myself or on behalf of any other individual, association or entity, as an agent or otherwise:
>
> (i) solicit or induce any of the customers of U.S. Bank for whom I directly performed any services or had any direct business contact, to acquire any product or service that currently is provided or under development by U.S. Bank from any entity other than U.S. Bank; or
>
> (ii) solicit or induce any of the customers or prospective customers of U.S. Bank, whose identity or other customer specific information I discovered or gained access to as a result of my access to U.S. Bank's Confidential Information, to acquire any product or service that currently is provided or under development by U.S. Bank from any entity other than U.S. Bank.[3]

[3] *See* Exhibit F (Kirk Agreement) and Exhibit H (Beumer Agreement), attached to the Complaint.

Likewise, the U.S. Bank non-solicitation agreement for Frederickson only prohibits "contact" for "the purpose of soliciting business or inducing such customer…," and states in relevant part:

> I agree that during the term of my employment with U.S. Bank, and for a period of one year thereafter, I will not, directly or indirectly, on behalf of myself or on behalf of any other individual, association or entity, as an agent or otherwise:
>
> (iii) contact any of the customers of U.S. Bank for whom I directly performed any services or had any direct business contact for the purpose of soliciting business or inducing such customer to acquire any product or service that currently is provided or under development by U.S. Bank from any entity other than U.S. Bank; or
>
> (iv) contact any of the customers or prospective customers of U.S. Bank whose identity or other customer specific information I discovered or gained access to as a result of my access to U.S. Bank's Confidential Information for the purpose of soliciting or inducing any of such customers or prospective customers to acquire any product or service that currently is provided or under development by U.S. Bank from any entity other than U.S. Bank.[4]
>
> ….

Importantly, key terms in these agreements are undefined, including the terms "solicit" and "induce." As a result, U.S. Bank is bound by the plain meaning of these terms, which do not, by their plain terms, restrict contacting clients for the purpose of announcing a change of employment. "Restrictive covenants … are 'strictly construed' in Minnesota and 'should not be extended beyond their true intent.'" *Cardiovascular Sys., Inc. v. Money*, 980 F. Supp. 2d 1102, 1104 (D. Minn. 2013) (quoting *Snyder's Drug Stores, Inc. v. Sheehy*

[4] *See* Exhibit G (Frederickson Agreement), attached to the Complaint.

*Props., Inc.*, 266 N.W.2d 882, 885 (Minn. 1978) (per curiam)). Moreover "[a]ny ambiguity in a restrictive covenant or any other contractual provision must be construed against the drafting party..." *Ibid*. The drafting party is U.S. Bank.[5]

Minnesota case law recognizes a distinction between an announcement and a solicitation. "Solicitation requires some element of attempted persuasion. Notification of an intent to leave a job is not enough." *Benfield, Inc. v. Moline*, No. CIV. 04-3513 (MJD/SRN), 2006 WL 452903, at *6 (D. Minn. Feb. 22, 2006). "Merely informing customers of one's former employer of a change of employment, without more, is not solicitation." *Id.* (quoting *Alpha Tax Servs., Inc. v. Stuart*, 761 P.2d 1073, 1075 (Ariz. Ct. App. 1988)). In *UBS Financial Services Inc. v. Christenson*, Chief Judge Michael J. Davis rejected the notion that a non-solicitation agreement bars all forms of client communication following a financial advisor's departure. The non-solicitation agreements at issue in *Christenson* prohibited the financial advisor "from directly or indirectly initiating 'any contact or communication, of any kind whatsoever, for the purpose of inviting, encouraging or requesting a client, or that may have the effect of inviting, encouraging or requesting a client ... to transfer his or her [UBS] account(s) to the departing Team Member or his or

[5] Courts approach restrictive covenant agreements with concern for the "average individual employee who as a result of his unequal bargaining power may be found in oppressive circumstances." *Gavaras v. Greenspring Media, LLC*, 994 F. Supp. 2d 1006, 1010 (D. Minn. 2014) (quoting *Bennett v. Storz Broad. Co.*, 270 Minn. 525, 533, 134 N.W.2d 892, 898 (1965)). A restrictive covenant is enforceable only if it is "necessary for the protection of the business or good will of the employer," and the "restriction on the employee is no greater than 'necessary to protect the employer's business..." *Ibid*. (quoting *Bennett*, 134 N.W.2d at 899).

her new employer.'" *UBS Fin. Servs., Inc. v. Christenson*, No. CIV. 13-1081 MJD/JSM, 2013 WL 2145703, at *5 (D. Minn. May 15, 2013). However, the District Court recognized a critical distinction between solicitation and mere contact, observing that "there is a difference between soliciting and contacting," and further, that the UBS agreement at issue barred solicitation and did not "bar all contact." *Ibid.* The District Court therefore concluded that "a neutral announcement" was "permissible and reasonable." *Ibid*.

Furthermore, in other cases, this Court has found solicitation based on the facts presented, but in analyzing the sufficiency of such facts, the Court has made a distinction between solicitation and merely announcing a job change. *See, e.g., Wells Fargo Invs., LLC v. Bengtson*, 2007 WL 2007997, at *1 (D. Minn. July 9, 2007) (finding Wells Fargo demonstrated a likelihood of success on the merits for its breach of contract claim based on violations of the non-solicitation agreement where the defendant's letters to clients went "*beyond merely informing the clients of his move to Merrill Lynch*," by actively soliciting business by promising future contact, "extolling the virtues of Merrill Lynch," and urging clients to continue to work together) (emphasis added); *Mobile Mini, Inc. v. Vevea*, No. CV 17-1684 (JRT/KMM), 2017 WL 3172712, at *6 (D. Minn. July 25, 2017) (applying Delaware law and finding that "*instead of merely announcing a job change*, the language of the [LinkedIn] posts here demonstrates that Vevea's purpose was to entice members of Vevea's network to call her for the purpose of making sales in her new position at Citi-Cargo") (emphasis added).

In distinguishing a permissible announcement from a solicitation in the financial services industry, Minnesota courts are consistent with other courts across the country which have reached a similar conclusion. In *Edward D. Jones & Co., L.P. v. Kerr*, 415 F. Supp. 3d 861, 873 (S.D. Ind. 2019), the District Court for the Southern District of Indiana found that a simple announcement by a financial advisor informing his clients of his change of employment did not constitute solicitation under a non-solicitation agreement governed by Missouri law. The District Court discussed other cases throughout the country and observed that distinguishing an announcement from a solicitation was the prevailing law:

> Our own research reveals that the majority of courts who analyzing this issue within the context of the financial broker/dealer industry reject the theory that an "announcement," like Mr. Kerr's, qualifies as a solicitation, even where an employment agreement prohibits both indirect as well as direct solicitations.

[*Id.* at 873].

Other federal courts have likewise recognized a financial advisor's right to announce their new employment. *See e.g.*, *WSFS Fin. Corp. v. Cobb*, No. 2:22-CV-815-MRP, 2023 WL 4552110, at *6-7 (E.D. Pa. July 14, 2023) (finding an email sent by Defendants to clients after resigning was not a solicitation but "merely notice of a change in their employment status," and further finding that "Courts interpreting the undefined term 'solicitation' in a restrictive covenant have found that an announcement of a change of employment is not actionable solicitation"); *Mariner Wealth Advisors, LLC v. Savvy Advisors, Inc.*, No. 1:24-CV-351, 2024 WL 3466153, at *8 (S.D. Ohio July 19, 2024) (quoting *ING Life Ins. & Annuity Co. v. Gitterman*, No. 10-4076, 2010 WL 3283526, at

*4–5 (D.N.J. Aug. 18, 2010)) ("Merely being in contact with former clients does not constitute solicitation.... Nor does this Court believe that the circumstantial evidence relied upon by Plaintiffs—namely, the withdrawal of many client accounts in a short time frame—necessarily indicates that they were solicited or encouraged to leave."); *Bank of Am. Inv. Servs., Inc. v. Byrd*, 2:09-CV-211, 2:09-CV-212, 2009 WL 10184606 (E.D. Va. June 15, 2009) (holding that Plaintiff had not made a clear showing of a reasonable likelihood of success on the merits when the brokers called clients to inform them of their departure and provided new contact information to clients); *Regions Bank v. Raymond James & Assocs., Inc.*, 2020 WL 6870815, Case No. 6:20-cv-685-Orl-40EJK (M.D. Fl. May 15, 2020) ("Additionally, Defendants produced unrefuted testimony that finance industry standards permit an announcement, either written or telephonic, following an employee's departure for another firm. Without making an ultimate determination on the issue, the Court believes that a phone call notifying former clients of a departure is unlikely to constitute a per se solicitation."); *UBS Paine Webber Inc. v. Dowd*, No. 015402 BLS, 2001 WL 1772856 (Sup. Ct. Mass. July 7, 2004) (a financial advisor's announcement to former clients which stated that he had joined a new firm, and included his new contact information, was not held to be a solicitation).

As the foregoing decisions in Minnesota and across the country have found, announcing a change of employment does not constitute a solicitation, particularly where the term "solicitation" is undefined in the agreement. Evidence of mere announcements and contact with clients does not constitute solicitation and warrant the entry of injunctive

relief. Here, U.S. Bank has failed to offer any reliable evidence showing that Defendants did more than announce a change of employment.

i. *The Patrek Declaration*

To support its Motion, U.S. Bank relies solely on the Patrek Declaration, which contains nothing more than allegations of "contact" and conclusory allegations of solicitation, with no real proof. The thrust of U.S. Bank's allegation is contained in Paragraph 19 of the Patrek Declaration, in which it alleges that, since Defendants resigned, "24 customers have confirmed that they were ***contacted*** by one or more of the Defendants during this timeframe." (Patrek Decl. ¶ 19.) Just five paragraphs later, the Patrek Declaration claims that these same 24 customers "verified they were ***solicited***…" (Patrek Decl. ¶ 26.) In the five paragraphs between these two allegations, there is no evidence offered by U.S. Bank to justify U.S. Bank's conclusory allegation that these 24 customers were solicited. Nothing in the Patrek Declaration explains how these 24 customers "verified they were solicited," and no declaration has been submitted directly from a customer. This allegation is devoid of any details regarding what was said, who said it, or whether any of the communications were an effort to solicit or induce clients to leave U.S. Bank and join Defendants' new employer.

U.S. Bank also alleges that "[m]ultiple customers reported that the calls they received from Kirk, Frederickson, and/or Beumer were for the purpose of encouraging the customer to move their business." (*Id*. at ¶ 22.) But this, too, lacks any reliability. U.S. Bank fails to identify which customers made these claims, to whom they spoke, when the

conversations occurred, or what was said. This allegation merely recounts what unnamed clients allegedly believed the purpose of the call was, and not what Defendants told these unnamed clients. Furthermore, Ms. Patrek does not allege to have been the person to have spoken to these unnamed clients and is not offering firsthand knowledge. Ms. Patrek seems to be recounting what others told her about their conversations with these unnamed clients, which is, at minimum, triple hearsay; yet, none of these other individuals are identified by her. Ms. Patrek fails to indicate how she became aware of these communications.

Other allegations in the Patrek Declaration do not show evidence of solicitation. Ms. Patrek alleges that one unnamed client claimed to be considering "next steps" after talking with Kirk. (*Id*. at ¶ 22.). This is not evidence of solicitation. Surely, clients have a right to consider "next steps" with their own accounts, which, in and of itself, does not mean that the client intended to move to Kirk at his new employer. This unnamed client may be considering staying at U.S. Bank or moving to another financial institution. Even if this client were considering transferring to Kirk, there is nothing wrong with the client doing so. Again, U.S. Bank is making an assumption, without proof.

Ms. Patrek also alleges that an unnamed client declined to meet with a U.S. Bank advisor after Kirk and Beumer resigned from U.S. Bank, and then eventually told U.S. Bank that he or she decided to transfer away from U.S. Bank. (*Id.* at ¶ 25.) This, again, is not evidence of solicitation. Significantly, U.S. Bank admits that it spoke to this client, but U.S. Bank fails to identify the client or include even a hearsay statement from the client about what Defendants allegedly told the client, so that a fact finder can decide if

solicitation really occurred. U.S. Bank's omission in this regard is not only telling, but it is also insufficient to carry its required burden of proof under *Dataphase*. The Patrek Declaration establishes only that Defendants had contact with these clients, but contact alone is not prohibited by the plain terms of Defendants' U.S. Bank non-solicitation agreements.

The only direct allegation that U.S. Bank makes against any Defendant is a vague, hearsay account concerning Frederickson. According to the Patrek Declaration, "[o]ne of the customers contacted by Frederickson stated that Frederickson offered to move the client's business" and that Frederickson allegedly "made disparaging comments about U.S. Bank, noting the reasons why she left." (*Id*. at ¶ 20) U.S. Bank fails to include any detail regarding the context of this statement, such as the name of the client, whether the client initiated the conversation with Frederickson, whether the client asked Frederickson about her reasons for leaving U.S. Bank, or whether the client asked to transfer his or her business to Frederickson. The Patrek Declaration also does not describe what Frederickson actually told the client, instead conclusory claiming that Frederickson "made disparaging comments about U.S. Bank." By omitting the alleged "disparaging comments," U.S. Bank deprives the fact finder of the ability to determine whether the alleged comments were disparaging and rose to the level of prohibited solicitation. Moreover, although this exchange was important enough to include in the Patrek Declaration, U.S. Bank did not include any sworn statement directly from this client or any other clients. Frederickson, on the other hand, has denied this interaction and denied soliciting clients. *See* Frederickson Decl., at ¶ 15.

Indeed, as for Defendants Kirk and Beumer, there are no allegations of any statements that they allegedly made to any clients. Beumer is mentioned in the Patrek Declaration only in passing, lumped together with the others through vague references to "Defendants," and without identifying a single statement that he allegedly made, a single client that he allegedly contacted, or any context suggesting any wrongful conduct. Despite claiming that 24 unnamed customers had "verified they were solicited" by Defendants, the Patrek Declaration provides no verifications from these clients, no description of any statements allegedly made by Defendants to these clients, no explanation of who spoke to these clients and how Ms. Patrek learned about them, and no evidence to adequately support a very serious allegation that Defendants are violating a post-employment non-solicitation agreement.

Courts have rejected evidence like that offered by U.S. Bank in this case as unreliable and insufficient for purposes of granting a TRO. In *Prudential Ins. Co. of Am. v. LaFontain*, No. 24-CV-940, 2024 WL 3802757, at *3 (E.D. Wis. Aug. 9, 2024), the U.S. District Court in the Eastern District of Wisconsin rejected a declaration of a managing director of Prudential, filed in support of an application for injunctive relief. There, the affiant averred that "[m]ore than twenty Prudential clients informed Prudential that they received calls from the defendants soliciting their business in the weeks after defendants resigned." 2024 WL 3802757, at *2-3. Like the Patrek Declaration in this case, the averments in *LaFontain* included numerous allegations of unnamed clients allegedly "informing" unnamed employees of the plaintiff broker dealer about certain interactions

with the defendant advisor, which the Court rejected as insufficient to show a likelihood of success on the merits. *Ibid*. Based on these failings, the District Court found:

> Plaintiffs do not submit an affidavit or declaration from any of the clients allegedly solicited by defendants. Nor do plaintiffs disclose the identities of these clients. Mr. Martinath states in his declaration that these clients "informed Prudential" of defendants' actions, without naming which Prudential employee the client spoke with. Though I may consider hearsay at the preliminary injunction stage, *SEC v. Cherif*, 933 F.2d 403, 412, n. 8 (7th Cir. 1991), evidence consisting of multiple layers of hearsay is inherently unreliable.
>
> [*See ibid.*]

Similarly, in *J.P. Morgan Securities LLC v. Shields*, the U.S. District Court for the Southern District of Indiana denied an employer's request for injunctive relief against a departing advisor because the allegation by J.P. Morgan Securities, LLC "rests entirely on its complaint allegations, which in relevant part are anonymous hearsay or made merely 'on information and belief' only.'"[6]

Likewise, in *J.P. Morgan Securities LLC v. Logsdon*, the U.S. District Court for the District of Kentucky denied JPMorgan's request for injunctive relief against its recently departed advisor for lack of evidence based on unnamed, anonymous clients:

> Although on the current record J.P. Morgan's likelihood of success is questionable, the most significant concern implicates the second prong. J.P. Morgan points to "at least ten" other clients whom it says Logsdon solicited, but it has not put forth any evidence to support its allegation of ongoing and harmful violation of the non-solicitation agreement. This does not mean that

[6] The court also denied JPMorgan's motion in *Shields* because the "injury flowing from wrongful transfer of client business from Plaintiff to Defendants is easily tracked, quantified, and compensated in money damages" *J.P. Morgan Sec. LLC v. Shields*, No. 118CV02788SEBMJD, 2018 WL 6426835 (S.D. Ind. Sept. 26, 2018).

> no such evidence exists, of course. But if it does, the record doesn't make it apparent.
>
> [*J.P. Morgan Sec. LLC v. Logsdon*, No. 3:22-CV-14-BJB, 2022 WL 509120 (W.D. Ky. Feb. 18, 2022)].

Here, U.S. Bank has failed to present any competent, reliable, and non-hearsay evidence of solicitation by Defendants. The Patrek Declaration is riddled with vague allegations, unnamed declarants, and layered hearsay, which deficiencies fall far short of the evidence required to justify injunctive relief. Instead, the Patrek Declaration refers vaguely to "contact" with clients. First, it states that "to date, 24 customers have confirmed that they were contacted by one or more of the Defendants." (Decl. ¶19.) Then it conclusively claims five (5) paragraphs later, without evidentiary support, that "24 customers have verified they were solicited." (Decl. ¶26.) U.S. Bank provides no details about what was said, who said it, or how any such contact allegedly violated the agreements. In fact, where U.S. Bank did have the opportunity to speak directly with a client, such as the one who declined to meet with a reassigned advisor (Patrek Decl. ¶ 25), it offers no allegation, let alone proof, that any Defendant said or did anything improper. These unsupported conclusions, devoid of factual content, do not constitute evidence. They amount to little more than conjecture. In fact, to date, U.S. Bank has not identified a single client who has transferred their account as a result of solicitation. This fact alone undermines U.S. Bank's sweeping claims of widespread misconduct.

Finally, in U.S. Bank's Memorandum of Law, U.S. Bank relies heavily on an online media article that it claims that "RBC facilitated the publication of..." *See* Memo of Law,

at 7. Relying on this article, U.S. Bank claims that "Kirk had already publicly declared that he was bringing $1 billion in assets under management with him to RBC Wealth Management." *See* Memo of Law, at 1. U.S. Bank also claims that "similar articles were published … touting the ten-figure portfolio that Kirk had already brought to RBC." *See* Memo of Law, at 7. If U.S. Bank is trying to suggest that $1 billion in assets was "brought" to RBC, U.S. Bank knows this is not the case. An article is also not evidence of solicitation. As case law recognizes in making a distinction between announcing and soliciting, clients should be informed that their trusted advisor has left his or her firm and be able to make an informed decision about what to do with their own accounts. Ultimately, the clients have the right to decide to transfer their assets and must authorize the transfer to RBC in writing.

As in *Christenson* and *Kerr*, the underlying factual circumstances of this case are straightforward and routine in the financial services industry. Announcing a change of employment in the financial services industry is not a solicitation. U.S. Bank has failed to show any reliable evidence that Defendants' conduct went beyond merely announcing their change of employment. Given the absence of such evidence, U.S. Bank has failed to show a likelihood of success on the merits.

b. U.S. Bank has not supported its Motion with sufficient evidence that Defendants violated their confidentiality agreements

The Patrek Declaration does not establish that Defendants took any confidential records from U.S. Bank. U.S. Bank's allegation that Defendants must have taken confidential information is baseless and based on pure speculation, unsupported by a single

piece of evidence. The fact that this allegation rests on speculation is laid bare by the allegation itself, wherein Ms. Patrek claims that "[t]he only way Defendants could have contacted these customers after their resignation would be if Defendants took Confidential Information with them after they resigned." (Patrek Decl. ¶ 24).

This is insufficient. The U.S. Bank agreements contain a confidentiality provision in which Defendants agreed to "treat as confidential all *records* of U.S. Bank…" (emphasis added).[7] The definition of "Confidential Information" in the agreements is "all records…that contain or refer to confidential or proprietary information of U.S. Bank or its customer…."[8] There is no evidence offered in the Patrek Declaration that Defendants retained any records of U.S. Bank. As stated in the Declarations submitted by the Defendants, Defendants did not use any confidential information or records from U.S. Bank to announce their new employment, and they even engaged in efforts to delete client contact information in their personal cell phones before resigning from U.S. Bank.

U.S. Bank's exact argument—that confidential information "must" have been taken—was rejected by this Court in *Wells Fargo Ins. Servs. USA, Inc. v. King*, No. 15-CV-4378 (PJS/JJK), 2016 WL 299013, at *7–8 (D. Minn. Jan. 25, 2016). There, the former employer similarly argued that the defendant "must have" used confidential information, defined to include customer names and contact information, because he "has been in contact with WFI's customers." *Ibid*. The Court disagreed, finding "[t]here is no evidence that King has in his possession any documents or other tangible things that contain WFI's

[7] *See* Exhibits E, F, and H attached to the Complaint.
[8] *Id*.

trade secrets or confidential information." *Ibid*. The Court also found that Plaintiff "offered no evidence that the names and contact information of its customers are not readily ascertainable by lawful means." *Id.* at 8. The Court held that Plaintiff had failed to show a likelihood of success on the merits to obtain an injunction "[b]ecause there is no evidence that King could not have lawfully ascertained the customer names and contact information." *Ibid.*

Similarly, here, there is no evidence Defendants retained any documents or other tangible things that contain U.S. Bank's confidential information. Like the argument rejected in *King*, U.S. Bank seems to be arguing for this Court to hold Defendants to a standard that any contact with any clients necessarily means they disclosed confidential information. The terms of the confidentiality agreements with U.S. Bank do not support U.S. Bank's broad, sweeping argument about its scope. Defendants know their clients. As this Court stated in another case in which a former employee contacted clients after resigning, the employer "cannot credibly argue that [the employee] should have erased her memory before going into business for herself." *See Ad Assocs., Inc. v. Coast to Coast Classifieds, Inc.*, No. CIV.04-3418(RHK/JSM), 2005 WL 3372968, at *5 (D. Minn. Dec. 12, 2005) ("customer names [Defendant] remembered and to whom she sent letters after finding corresponding contact information do not qualify as trade secrets under Minnesota law"). Also, clients deciding to transfer to Defendants is not proof that any confidential information was taken. *See Moeschler v. Honkamp Krueger Fin. Servs., Inc.*, No. 21-CV-0416 (PJS/DTS), 2021 WL 4273481, at *6 (D. Minn. Sept. 21, 2021) ("The fact that a

client followed Moeschler to Mariner is not proof that Moeschler misappropriated any trade secrets or confidential information.”).

U.S. Bank’s allegation that Defendants took confidential information is based on nothing more than its belief, which is mistaken. Indeed, U.S. Bank admits that, even before filing this case, counsel for Defendants confirmed that they had not taken any confidential information, and also confirmed that client contact information was deleted from their cell phones before resigning from U.S. Bank. As Defendants have confirmed in their Declarations, they did in fact delete client information from their cell phones. Only Defendants Frederickson and Beumer discovered after joining their new employer that they had inadvertently failed to delete *one* client contact from their cell phones, respectively, which they did not rely upon or use. This does not warrant entering an injunction. U.S. Bank’s allegation that they improperly retained confidential information is wrong.

### C. U.S. BANK HAS NOT SHOWN AND CANNOT SHOW ANY IRREPARABLE HARM

U.S. Bank offers no concrete evidence that it faces imminent or irreparable harm. “Plaintiff must first establish that irreparable harm will result without injunctive relief and that such harm will not be compensable by money damages.” *Northland Ins. Companies v. Blaylock*, 115 F. Supp. 2d 1108, 1116 (D. Minn. 2000). “Possible or speculative harm is not enough.” *Ibid*. “[F]ailure to show irreparable harm is an independently sufficient ground upon which to deny a preliminary injunction.” *Medtronic, Inc. v. Ernst*, 182 F. Supp. 3d 925, 934 (D. Minn. 2016) (quoting *Watkins, Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003)). “Irreparable harm occurs when a party has no adequate remedy at law,

typically because its injuries cannot be fully compensated through an award of damages." *Id.* (citing *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009)).

Any potential loss U.S. Bank may suffer is purely economic and easily quantifiable. The fact that U.S. Bank has claimed that approximately $700 million in assets, generating $4 million in revenue, is under threat, demonstrates that it tracks client assets under management and revenue generated from those accounts. This tracking makes any alleged harm calculable, not irreparable. Such economic loss, even if significant, does not warrant injunctive relief.

In *King, supra*, this Court rejected an argument that the Plaintiff would suffer irreparable harm if clients transferred to the employee, finding:

> First, this case is about money. No historic building is going to be destroyed. No toxins are going to be released into the environment. No ship is going to leave port, never to return. King stole clients away from WFI, and the main harm that WFI suffered is lost profits on the business of those clients. By definition, lost profits are "reparable" through money damages.
>
> [*Wells Fargo Ins. Servs. USA, Inc. v. King*, No. 15-CV-4378 (PJS/JJK), 2016 WL 299013, at *8 (D. Minn. Jan. 25, 2016).]

Other courts have similarly rejected arguments by financial institutions that they will suffer irreparable harm by loss of clients. In denying a TRO, the Northern District of Georgia in *Morgan Stanley DW, Inc. v. Frisby*, 163 F. Supp. 2d 1371, 1375-76 (N.D. Ga. 2001) explained:

> [t]he securities industry is highly regulated. Each individual transaction is monitored electronically. Every customer transfer from Morgan Stanley is documented. Every executed trade is recorded. Every dollar earned in fees by Defendants doing business with those customers that Morgan Stanley

> considers its own can be traced precisely. Any loss Morgan Stanley might suffer as a result of Defendants' departure is calculable.[9]

Similarly, in *Regions Bank v. Raymond James & Associates, Inc.*, 2020 WL 6870815, at 5*, Case No. 6:20-cv-685-Orl-40EJK (M.D. Fl. May 15, 2020), the U.S. District Court for the Southern District of Florida held that there was no irreparable harm to support injunctive relief in the securities industry because money damages were adequate. *Id*. ("Virtually all of the potential injuries caused by Defendants' alleged misconduct are compensable through monetary damages").

Here, U.S. Bank has offered no evidence that quantifying any losses would be impossible or that Defendants' alleged breach of contract cannot be remedied by money damages. In fact, its own allegations are overblown. The notion that $700 million in assets is under threat to transfer away from U.S. Bank is simply not accurate. U.S. Bank inaccurately claimed in its Memo of Law in support of its Motion that "Defendants have already successfully moved millions of dollars in assets under management as a direct result of their wrongful conduct." *See* Memo of Law, at 1. In actuality, at the time that U.S. Bank filed this litigation, only one client had signed paperwork to transfer their assets to Defendants at their new employer, but the assets had not transferred yet.

---

[9] *See also, e.g., Merrill Lynch, Pierce, Fenner & Smith v. Bennert*, 980 F. Supp. 73, 75 (D. Me. 1997) (damages caused by the departure of brokers to a competing firm could be calculated by reference to past earnings and expert testimony); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. de Liniere*, 572 F. Supp. 246, 249 (N.D. Ga. 1983) (holding that any loss of business caused by ex-employees' solicitation of former customers "may be adequately redressed with money damages" and that the real losses were commissions which could be "readily calculated").

Any alleged harm caused by the loss of client assets would be compensable through money damages based on the easily determined value of those assets and the revenue. Accordingly, U.S. Bank has failed to show that it has suffered any irreparable harm.

### D. THE BALANCE OF EQUITIES WEIGHS IN FAVOR OF DEFENDANTS

"The essential inquiry in weighing the equities is whether the balance tips decidedly toward the movant." *Northland Ins. Companies v. Blaylock*, 115 F. Supp. 2d 1108, 1117 (D. Minn. 2000).

Courts have recognized that denying an injunction is far less burdensome for large financial institutions than the issuance of one is for advisors, who risk damage to their careers, reputations, and client relationships. *See Morgan Stanley DW, Inc. v. Frisby*, 163 F. Supp. 2d 1371, 1381 (N.D. Ga. 2001) ("Brokerage firms can survive the denial of an injunction far more readily than their departing employees can survive its issuance."). That reasoning is especially apt here. Defendants are experienced professionals who rely on their ability to maintain relationships and earn a living through their trust and reputation. A TRO, issued without any credible evidence, would unjustly and potentially jeopardize their relationships and irreparably tarnish their standing in the industry.

Indeed, Defendants have experienced reputational harm. The public filing of U.S. Bank's complaint has triggered media attention and subjected Defendants to reputational damage based on unproven and baseless claims. In *Regions Bank*, the District Court recognized that "the issuance of a preliminary injunction will impose extreme costs on Defendants—most significantly in the form of reputational injuries." *See Regions Bank v.*

*Raymond James & Assocs., Inc.*, 2020 WL 6870815, at *5, No. 6:20-cv-685 (M.D. Fl. May 15, 2020). Thus, "the Court hesitate[d] to brand Defendants with an insinuation of wrongdoing without more definitive evidence to that effect." *Id.*

This same concerns are at issue here. On May 1, 2025, at around 3:40pm CT, just one day after U.S. Bank filed its Complaint, the Minnesota Star Tribune published a story with the headline: "Ex-wealth managers took rich clients worth $700 million, U.S. Bank alleges in lawsuit."[10] This headline is misleading and inaccurate, as $700 million has not transferred and is not under threat of transferring. In fact, U.S. Bank does not even allege that $700 million has already transferred. This article has also been disseminated to professionals in the community with whom Defendants have a relationship. Issuing an injunction would amplify the damage already done to their reputations.

### E. GRANTING AN INJUNCTION WILL NOT SERVE THE PUBLIC INTEREST

"The final *Dataphase* factor requires the court to consider the public interest." *Northland*, 115 F. Supp. 2d at 1125. Here, an injunction would not serve the public interest by interfering with clients' right to choose their financial advisor. In a relationship-driven industry, clients rely on the years of trust, rapport, and personal attention from their advisor. Preventing clients from receiving a simple announcement from their trusted advisor about a change in employment would not be in the public interest and would ultimately deprive

[10] *See* "Ex-wealth managers took rich clients worth $700 million, U.S. Bank alleges in lawsuit," which is available at https://www.startribune.com/ex-wealth-managers-took-rich-clients-worth-700-million-us-bank-alleges-in-lawsuit/601342959.

clients of the ability to make informed decisions about their financial future. *See e.g., Variable Annuity Life Ins. Co. v. Laeng*, 8:12-cv-2280-T-33MAP, 2013 WL 499982, at * 7 (M.D. Fl. Jan. 2, 2013) (denying plaintiff's request for a preliminary injunction because, *inter alia*, "the public interest is better served with open competition in the securities field and access to advisors of clients' choice"); *Frisby*, *supra*, 163 F. Supp. 2d at 1322 ("The public has little interest in having its choice restricted to brokers other than the one who has served them pending the resolution of this dispute…the inability of a client to consult with a trusted advisor for even a single day could result in enormous financial losses").

Indeed, while this Court in *Christenson* granted a preliminary injunction, it still recognized that "the public has an interest in allowing consumers to choose the advisor with whom they would like to do business, an interest acknowledged by FINRA Rules," and it fashioned an appropriate remedy to still permit an announcement. *Christenson*, 2013 WL 2145703, at *6. Another District Court in Florida further found that, in the financial securities industry, the public interest is served by the client having an informed choice, and that the employer "is not restricted in any way from in good faith attempting to convince these clients to keep their accounts at [the employer] but ultimately it is each client's own informed decision to make." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. McCullen*, No. 95-14329-CIV-PAINE, 1995 WL 799537, at *3 (S.D. Fla. Dec. 13, 1995). So too here, after the permissible announcement, it is each client's informed decision to make about what to do with their accounts. Therefore, U.S. Bank has not established that granting an injunction will serve the public interest.

### F. IF INJUNCTIVE RELIEF IS GRANTED, AN APPROPRIATE ORDER SHOULD BE ENTERED TO BALANCE THE PUBLIC INTEREST AND PROTECT THE CLIENTS

a. U.S. Bank's Proposed TRO is Overly Broad

The proposed TRO submitted by U.S. Bank (*see* ECF 9) seeks to enjoin Defendants from soliciting clients for the "pendency of this action," despite the fact that the agreements only prohibit Defendants from soliciting for one year after the date of their departures from U.S. Bank, i.e. through April 15, 2026. This action could still be pending after such date.

Additionally, U.S. Bank's proposed TRO seeks to enjoin Defendants from soliciting clients for the purposes of "acquir[ing] any product or service that is currently provided or under development by U.S. Bank from RBC Wealth Management." (*see* ECF 9). The reference to products or services "under development" by U.S. Bank is overly broad and unknown (and possibly unenforceable). "U.S. Bank" is also defined in the agreements to include its affiliates, including U.S. Bancorp Investments, Inc., its affiliated FINRA broker dealer with which Kirk was registered. Defendants could not possibly have knowledge of every product "under development" by all of these companies. This vague and undefined language creates a scope of restriction that is neither reasonable nor practical to follow.

b. Clients Should Not Be Put in the Middle of this Case

Furthermore, clients should not be put in the middle of this case. If a TRO is entered, courts, including this court, have fashioned appropriate remedies that balance the interests. Defendants should be permitted to continue announcing to any clients to whom they have not announced. As this Court in *Christensen* found in permitting a neutral announcement,

"the public has an interest in allowing consumers to choose the advisor with whom they would like to do business, an interest acknowledged by FINRA Rules." *Christenson*, 2013 WL 2145703, at *6. Moreover, clients are not prohibited from transferring their business to Defendants. *See Moeschler, supra,* No. 21-CV-0416 (PJS/DTS), 2021 WL 4273481, at *6 ("It is entirely possible—perhaps even likely—that some of Moeschler's clients followed him to Mariner on their own initiative simply because they thought that he had done a good job for them and they wanted to continue to work with him."). Therefore, a TRO should also not prohibit Defendants from accepting the client's business if the client requests to continue working with Defendants, including responding to any clients who ask questions, attending meetings requested by clients, and taking necessary steps to facilitate the requested account transfer. When entering TROs, other courts, like *Christensen*, have included appropriate remedies to allow for announcing to clients, responding to questions, attending meetings requested by clients or accepting clients' requests to transfer business.[11]

Although Defendants dispute that a TRO is warranted, should the Court be inclined to grant a TRO, Defendants have submitted a proposed order to the Court as an alternative to U.S. Bank's proposed order, which seeks to protect the clients who want to communicate

[11] *See, e.g., Mariner Wealth, supra,* No. 1:24-CV-351, 2024 WL 3466153, at *12 (entering TRO, but allowing "informational contacts" and ability to respond to client questions (and finding no party disputed ability to accept business)); *J.P. Morgan Secs., LLC v. Goldinger*, Index No. 655340 (NY Sup. Sept. 13, 2021) (attached as Exhibit A) (entering TRO, but allowing announcements and acceptance of business); *Citibank, N.A., et. al. v. Vahab, et. al.*, Index No. 651795 (NY Sup. March 19, 2021) (attached as Exhibit B) (entering TRO, but allowing announcements and acceptance of business); *J.P. Morgan Secs., LLC v. Sefardi,* Index No. 654352 (NY Sup. Nov. 21, 2022) (attached as Exhibit C) (entering TRO, but allowing announcing, responding to clients, and acceptance of business).

with and continue working with Defendants at RBC. The clients have a right to do so. U.S. Bank cannot stop the clients from choosing to do what they want with their own accounts. Further, if U.S. Bank can prove any wrongful solicitation, it can request money damages.

## CONCLUSION

Based on the foregoing, Defendants respectfully request that the Court deny Plaintiff's Motion for a Temporary Restraining Order.

Dated: May 23, 2025

Respectfully submitted,

**MOSS & BARNETT**

By: /s/ *Craig A. Brandt*
Craig A. Brandt, Esq.
Moss & Barnett
150 South Fifth Street, Suite 1200
Minneapolis, MN 55402
Tel.: (612) 877-5360
Email: Craig.Brandt@lawmoss.com

Of counsel:

**STEVENS & LEE**
A Pennsylvania Professional Corporation

By: */s/ Jonathan A. Scobie*
Thomas B. Lewis (*pro hac vice* granted)
Jonathan A. Scobie (*pro hac vice* granted)
Stevens & Lee
510 Carnegie Center Drive, Suite 400
Princeton, NJ 08540
Tel.: (609) 987-6656
Email: thomas.lewis@stevenslee.com
Email: jonathan.scobie@stevenslee.com

*Attorneys for Defendants James Kirk, Darcy Frederickson, and Jason Beumer*