## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

U.S. BANK NATIONAL
ASPlaintiff,OCIATION,

       Plaintiff,

v.

JAMES KIRK, DARCY
FREDERICKSON, and JASON
BEUMER,

       Defendants.

Case No. 25-cv-1926 (LMP/DTS)

**ORDER GRANTING IN PART AND
DENYING IN PART
PLAINTIFF'S MOTION FOR A
PRELIMINARY INJUNCTION**

---

Melissa R. Muro LaMere, Carmen-Marie Carballo, and Jeremy Krahn, **Maslon LLP, Minneapolis, MN**, for Plaintiff.

Craig A. Brandt, **Moss & Barnett, Minneapolis, MN**, and Thomas B. Lewis and Jonathan A. Scobie, **Stevens & Lee, P.C., Princeton, NJ**, for Defendants.

  Plaintiff U.S. Bank National Association ("U.S. Bank") alleges that three of its former employees—Defendants James Kirk ("Kirk"), Darcy Frederickson ("Frederickson"), and Jason Beumer ("Beumer")—are using U.S. Bank's confidential information and soliciting U.S. Bank's clients in violation of Defendants' contractual obligations to U.S. Bank. *See generally* ECF No. 1. U.S. Bank moved for a temporary restraining order ("TRO") to enjoin Defendants from improperly using U.S. Bank's confidential information or soliciting U.S. Bank's clients. *See* ECF No. 4. The motion has been briefed and a hearing on the motion was held, at which the parties consented to convert the TRO motion to a preliminary-injunction motion. For the following reasons, U.S. Bank's motion is granted in part and denied in part.

## FACTUAL BACKGROUND[1]

Defendants were formerly employed by U.S. Bank's Private Wealth Management ("PWM") division for periods ranging from 10 to 27 years. ECF No. 7 ¶¶ 9–10. Kirk was employed as a Private Wealth Advisor, Frederickson was employed as a Wealth Strategist, and Beumer was employed as a Managing Director. *Id.* ¶ 10. PWM is a division of U.S. Bank that provides wealth management services to clients who have a net worth ranging from approximately $3 million to $75 million. *Id.* ¶ 2. U.S. Bank explains that PWM's success hinges on its relationships and goodwill with its clients and prospective clients. *Id.* ¶ 4. As a result, U.S. Bank makes "substantial investments in building and fostering trust with its PWM customers." *Id.* Part of that trust, U.S. Bank explains, is earned through "U.S. Bank's careful protection of its confidential information, which includes its customers' confidential information and other U.S. Bank trade secrets." *Id.*

As a condition of their employment with U.S. Bank, Kirk and Beumer signed a Confidentiality and Non-Solicitation Agreement ("CNS Agreement"), in which they agreed not to use or disclose U.S. Bank's confidential information other than for a legitimate work purpose and agreed to keep U.S. Bank's confidential information "secret and in strict confidence during and subsequent to [their] employment with U.S. Bank." ECF No. 1-1 at 14–15, 22–23. "Confidential information" is defined broadly by the CNS Agreement to include:

---

[1] The record is derived from the verified complaint and the declarations of Defendants, Melissa Muro LaMere, Heather Day Patrek, and Andrew Waters, and the exhibits included with those declarations.

[T]he names, addresses, and telephone numbers of its customers and prospective customers (collectively "customers"), the investment portfolios of its customers and any information concerning customers' past, present, or future investment activities, any documents or records reflecting work in process, and any information relating to U.S. Bank's customers' banking or trust relationships, customers' income, net worth or other business or personal financial information;

[A]ny information concerning U.S. Bank's methods, operations, financing, services, pricing information, compensation data, pending projects and proposals, research and development strategies, production reports, financial and marketing information, technological developments, software, computer systems, techniques, processes, as well as policy or procedure manuals or training materials; and

[A]ny other secret or confidential information relating to the products, services, customers, sales, technology and business affairs of U.S. Bank.

*Id.* at 14, 22. Kirk and Beumer were further prohibited from using U.S. Bank's confidential information to solicit clients away from U.S. Bank. *Id.* at 15, 23. Kirk and Beumer also agreed to return any U.S. Bank confidential information to U.S. Bank upon termination of their employment. *Id.*

As for their non-solicitation obligations, Kirk and Beumer agreed in the CNS Agreement that for a period of one year after their termination of employment with U.S. Bank, they would not:

[S]olicit or induce any of the customers of U.S. Bank for whom [they] directly performed any services or had any direct business contact, to acquire any product or service that currently is provided or under development by U.S. Bank from any entity other than U.S. Bank; or

[S]olicit or induce any of the customers or prospective customers of U.S. Bank, whose identity or other customer specific information [they] discovered or gained access to as a result of [their] access to U.S. Bank's Confidential Information, to acquire any product or service that currently is provided or under development by U.S. Bank from any entity other than U.S. Bank.

3

*Id.*  Frederickson also signed a CNS Agreement in 2003 in connection with her eligibility for the U.S. Bancorp Stock Incentive Plan.  *Id.* at 19–20; ECF No. 7 ¶ 9.  The parties do not dispute that the terms of Frederickson's CNS Agreement are the same in all relevant respects to the terms of Kirk's and Beumer's CNS Agreement.[2]

Defendants had worked primarily with PWM clients with a net worth of approximately $10 million to $75 million each while at U.S. Bank.  ECF No. 7 ¶ 11.  In the course of their employment, Defendants received access to U.S. Bank confidential information to service these clients' accounts.  *Id.* ¶ 10.  Collectively, Defendants serviced U.S. Bank relationships worth over $4 billion in assets under management.  *Id.* ¶ 11.

On April 15, 2025, Defendants submitted largely identical resignation letters to U.S. Bank announcing that they were resigning effective immediately, that they conducted themselves in accordance with the terms of their employment, and that any questions may be directed to their shared attorney.  *See* ECF No. 1-1 at 2, 4, 6.  The same day, RBC Wealth Management ("RBC"), a competitor to U.S. Bank, published an online article regarding Kirk's departure from U.S. Bank.  The article stated that Kirk was joining RBC "from U.S. Bank with more than $1 billion in assets under management."[3]  U.S. Bank soon learned that Beumer and Frederickson had also joined RBC.  ECF No. 7 ¶ 15.

---

[2]    The Court discerns some differences in language between the CNS Agreement that applies to Frederickson and the CNS Agreement that applies to Kirk and Beumer.  At this stage of the proceedings, however, those differences are immaterial.

[3]    *See Jim Kirk Joins RBC Wealth Management in Minneapolis*, ADVISOR MAG. (Apr. 17, 2025), https://www.lifehealth.com/people/jim-kirk-joins-rbc-wealth-management-in-minneapolis/ [https://perma.cc/4ET6-FDVD].

Since Defendants' departure from U.S. Bank, U.S. Bank has been in the process of contacting every client that worked with any of the Defendants to provide these clients with information about who will handle their accounts going forward and to answer any questions the clients may have about their accounts. *Id.* ¶ 18. From these communications, U.S. Bank learned that at least 24 clients "were contacted by one or more of the Defendants" after April 15, 2025, and that "[m]ultiple customers reported that the calls they received from Kirk, Frederickson, and/or Beumer were for the purpose of encouraging the customer to move their business from U.S. Bank" to RBC. *Id.* ¶¶ 19, 22.

As an example, U.S. Bank reports that one of the clients stated that Frederickson offered to move the client's business to RBC and tried to persuade the client to do so by stating that the client's new Portfolio Manager at RBC would be the former boss of their current Portfolio Manager at U.S. Bank. *Id.* ¶ 20. The client also shared that Frederickson made disparaging comments about U.S. Bank, noting the reasons why she left, and warning about her alleged discomfort with the direction of U.S. Bank, which she claimed was "bad" for U.S. Bank clients. *Id.*

Another client—a U.S. Bank client since 1992—confirmed to U.S. Bank that they had been contacted by Kirk and Beumer within two days of the pair's departure from U.S. Bank. *Id.* ¶ 25. The client ultimately decided to move their business to RBC to work with Kirk and Beumer. *Id.* Another client confirmed in writing that they were contacted by Kirk on April 18, 2025, and stated that they would be considering their "next steps" after that call. *Id.* ¶ 21.

For the 24 clients that confirmed that they were contacted by one or more of the Defendants thus far, these clients represent combined assets under management of nearly $700 million and $4 million in annual revenue. *Id.* ¶ 26. U.S. Bank asserts that "it will be very difficult to calculate the lost revenue and lost profits that U.S. Bank will experience because variables such as investment growth, contributions, distributions, length of future relationship, and beneficial introductions the client could make to the U.S. Bank team would all contribute to U.S. Bank's losses." *Id.* ¶ 27.

On April 30, 2025, U.S. Bank brought this action against Defendants, alleging that Defendants breached both the confidentiality and non-solicitation provisions of the CNS Agreement. *See* ECF No. 1. U.S. Bank brings state-law causes of action for breach of contract, tortious interference with business expectancy, and tortious interference with business relations.[4] *Id.* ¶¶ 62–80.

U.S. Bank contemporaneously moved for a TRO to enjoin Defendants from further violating the confidentiality and non-solicitation provisions of the CNS Agreement. ECF No. 4. Defendants responded to U.S. Bank's TRO motion, denying that they had violated the confidentiality and non-solicitation provisions of the CNS Agreement. *See* ECF No. 34. Defendants state that after joining RBC, they contacted some of their U.S. Bank clients solely to alert them that they had resigned from U.S. Bank and joined RBC. ECF

---

[4] The Court's subject-matter jurisdiction is based on diversity jurisdiction. *See* 28 U.S.C. § 1332. U.S. Bank is a national banking association, and its Articles of Association provide that its main office is in Ohio. ECF No. 1 ¶ 33. Pursuant to 28 U.S.C. § 1348, U.S. Bank is a citizen of Ohio, and Defendants are all citizens of Minnesota, ECF No. 1 ¶¶ 29–31, meaning that complete diversity of citizenship exists. Moreover, no party disputes that the amount in controversy in this case exceeds $75,000.

No. 36 ¶ 9; ECF No. 37 ¶ 9; ECF No. 38 ¶ 9.  However, they deny that this contact constituted "solicitation" of U.S. Bank's clients.  ECF No. 36 ¶ 14; ECF No. 37 ¶ 14; ECF No. 38 ¶ 14.  Defendants also deny that they took any U.S. Bank confidential information upon leaving U.S. Bank, and state that they deleted contact information for their U.S. Bank clients from their personal cell phones upon leaving U.S. Bank.  ECF No. 36 ¶¶ 8, 10, 13; ECF No. 37 ¶¶ 8, 10, 13; ECF No. 38 ¶¶ 8, 10, 13.  Defendants state that they "d[id] not need any confidential or proprietary information of U.S. Bank" to contact their U.S. Bank clients, given that Defendants are close with their clients, sometimes personally.  ECF No. 36 ¶ 11; ECF No. 37 ¶ 11; ECF No. 38 ¶ 11.

The Court held a hearing on the motion on May 29, 2025.  *See* ECF No. 45.  In response to declarations filed by U.S. Bank the day before the hearing, ECF Nos. 41, 42, the Court permitted Defendants to respond to those declarations no later than June 3, 2025.  Defendants did so, ECF No. 46, and the motion was taken under advisement at that time.

## ANALYSIS

A district court may grant a preliminary injunction when a moving party shows that four factors weigh in its favor: (1) the plaintiff is likely to succeed on the merits; (2) the plaintiff is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in the plaintiff's favor; and (4) an injunction is in the public interest.  *See Cigna Corp. v. Bricker*, 103 F.4th 1336, 1342 (8th Cir. 2024).

## I.    Likelihood of Success on the Merits

When assessing the likelihood of U.S. Bank's success on the merits, the Court need not determine whether U.S. Bank will ultimately succeed, but rather it must decide whether

U.S. Bank has a "fair chance of prevailing." *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 731–32 (8th Cir. 2008) (en banc) (citation omitted). To show it has a "fair chance of prevailing," U.S. Bank need not "prove a greater than fifty per cent likelihood" of succeeding. *Jet Midwest Int'l Co. v. Jet Midwest Grp., LLC*, 953 F.3d 1041, 1044–45 (8th Cir. 2020) (citation omitted). Additionally, U.S. Bank only needs to establish that it is likely to succeed on the merits of one of its claims. *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1040 (8th Cir. 2016). The parties focus on the likelihood of U.S. Bank succeeding on its breach-of-contract claim, so the Court likewise focuses on that claim.

Under Minnesota law, an action for breach of contract requires three elements: (1) formation of a contract, (2) performance by plaintiff of any conditions precedent to its right to demand performance by the defendant, and (3) breach of the contract by the defendant. *Park Nicollet Clinic v. Hamann*, 808 N.W.2d 828, 833 (Minn. 2011). Defendants do not dispute that U.S. Bank has satisfied the first two elements of its breach-of-contract claim, so the analysis turns on the third element: whether Defendants breached the CNS Agreement. U.S. Bank asserts two distinct theories of breach: (1) a breach of the CNS Agreement's non-solicitation provision, and (2) a breach of the CNS Agreement's confidentiality provision. The Court addresses each theory in turn.

### a.    Whether U.S. Bank Has a Fair Chance of Prevailing on its Claim that Defendants Breached the Non-Solicitation Provision

U.S. Bank claims that at least 24 clients "were contacted by one or more of the Defendants" after April 15, 2025, and that "[m]ultiple customers reported that the calls they

received from Kirk, Frederickson, and/or Beumer were for the purpose of encouraging the customer to move their business from U.S. Bank" to RBC. ECF No. 7 ¶¶ 19, 22. Defendants admit that they contacted former clients but claim that they merely informed the clients that they had left U.S. Bank and moved to RBC. ECF No. 36 ¶¶ 9, 14; ECF No. 37 ¶¶ 9, 14; ECF No. 38 ¶¶ 9, 14. Defendants assert that this contact does not constitute "solicitation" within the meaning of the CNS Agreement. ECF No. 34 at 12.

The CNS Agreement prohibits Defendants from "solicit[ing]" their U.S. Bank clients or "induc[ing]" their U.S. Bank clients to obtain services from an entity other than U.S. Bank. ECF No. 1-1 at 15, 20, 23. The Court agrees with Defendants that solicitation or inducement requires an invitation or encouragement for U.S. Bank clients to join Defendants at RBC. *See Benfield, Inc. v. Moline*, No. 04-cv-3513 (MJD/SRN), 2006 WL 452903, at *6 (D. Minn. Feb. 22, 2006) ("Solicitation requires some element of attempted persuasion."); *see also Solicitation*, Black's Law Dictionary (12th ed. 2024) (defining "solicitation" as the "act or an instance of requesting or seeking to obtain something; a request or petition"). Accordingly, "solicitation" does not occur when a client initiates contact with the former employee, *see Honeywell Int'l Inc. v. Stacey*, No. 13-cv-3056 (PJS/JJK), 2013 WL 9851104, at *8 (D. Minn. Dec. 11, 2013), or when the employee merely offers a "neutral announcement" of their new employer to their clients, *UBS Fin. Servs., Inc. v. Christenson*, No. 13-cv-1081 (MJD/JSM), 2013 WL 2145703, at *5 (D. Minn. May 15, 2013).

Under this framework, U.S. Bank has shown a fair chance of prevailing on its breach-of-contract claim against Frederickson only. U.S. Bank has identified an instance

of Frederickson going beyond a mere "neutral announcement" of her new employer to actively encourage a U.S. Bank client to leave U.S. Bank and join Frederickson at RBC. ECF No. 7 ¶ 20. Specifically, Frederickson offered to facilitate the transfer of the client's accounts to RBC and told this client that their Portfolio Manager at RBC would be the former boss of their current Portfolio Manager at U.S. Bank, which would ease the transition to RBC. *Id.* Frederickson also disparaged the "direction" of U.S. Bank, the natural consequence of which would be to induce the client to jump ship at U.S. Bank and move their assets to RBC. *Id.* This contact goes well beyond a neutral announcement. It demonstrates the requisite persuasion that impermissible solicitation requires. *See Moline*, 2006 WL 452903, at *6.

In response, Frederickson attacks U.S. Bank's allegation as "hearsay" and "vague." ECF No. 34 at 20. But the Court may consider hearsay at this preliminary stage, *see Storage Concepts, Inc. v. Incontro Holdings, L.L.C.*, 8:20-cv-447, 2021 WL 1789205, at *9 (D. Neb. May 5, 2021) (collecting cases), and the Court believes the statement from U.S. Bank is specific enough to determine that it constitutes solicitation, if ultimately proven. Notably, Frederickson also does not claim that this client initiated contact with her. Accordingly, on this record, U.S. Bank has a fair chance of prevailing on its claim that Frederickson breached the CNS Agreement's non-solicitation provision.

The same cannot be said for Kirk and Beumer. U.S. Bank recounts that "[m]ultiple customers reported that the calls they received from Kirk, Frederickson, and/or Beumer were for the purpose of encouraging the customer to move their business from U.S. Bank to Defendants' new employer." ECF No. 7 ¶ 22. This statement—which lumps all three

Defendants together—is entirely conclusory and offers no facts from which the Court could actually determine that the alleged contact was "for the purpose of encouraging the customer to move their business from U.S. Bank" to RBC. *Id.* The Court need not credit vague allegations of solicitation. *See Piper Sandler & Co. v. Gonzalez*, No. 23-cv-2281 (PJS/DTS), 2023 WL 5426000, at *1 (D. Minn. Aug. 23, 2023) (finding no likelihood of success where "the information in the record about the [solicitation] incident [was] vague and contradictory"); *Aon plc v. Alpine Rewards, LLC*, No. 22-cv-4762, 2023 WL 3713987, at *9 (N.D. Ill. Apr. 12, 2023) (denying TRO where allegations of solicitation were "conclusory" and "inexplicably lacking in specifics").

U.S. Bank next asserts that a client "confirmed in writing that they were contacted by Kirk on April 18, 2025, and stated that they would be considering their 'next steps' after that call." ECF No. 7 ¶ 21. But that allegation is entirely consistent with Kirk's version of events; namely, that he simply informed his clients that he had joined RBC. ECF No. 36 ¶ 14. There is no violation of the CNS Agreement if the client considers "next steps," so long as Kirk did not *encourage* the client to consider "next steps." U.S. Bank does not allege that the latter occurred, so this example does not demonstrate an instance of solicitation.

The same conclusion applies to U.S. Bank's reservation about a long-term client leaving U.S. Bank after being contacted by Kirk and Beumer. *See* ECF No. 7 ¶ 28. Again, U.S. Bank does not allege that Kirk and Beumer encouraged or persuaded the client to leave U.S. Bank. All U.S. Bank alleges is that (1) Kirk and Beumer contacted the client, and (2) the client left U.S. Bank and joined RBC. *Id.* Without some evidence that Kirk

11

and Beumer attempted to persuade the client to leave U.S. Bank, this example also does not demonstrate solicitation.

U.S. Bank also observes that an article posted on the day that Kirk left U.S. Bank relayed that he was joining RBC "with more than $1 billion in assets under management." ECF No. 6 at 24. This would suggest, if anything, that Kirk had solicited clients prior to his departure from U.S. Bank. But U.S. Bank has not alleged any pre-departure instances of solicitation, nor has it alleged that Kirk actually succeeded in transferring $1 billion in assets under management to RBC. The probative weight of this statement in demonstrating solicitation, therefore, is minimal.

Finally, U.S. Bank states that another of Kirk's clients left U.S. Bank and joined RBC. ECF No. 7 ¶ 25. This statement does not allege any contact by Kirk at all; rather, it relies on the assumption that because the client left U.S. Bank for RBC, Kirk must have solicited the client. That assumption, which is not supported by any record evidence, does not illustrate an example of solicitation. *Alpine Rewards*, 2023 WL 3713987, at *8 (rejecting the "assumption that because [new employer] now services [former employer's] clients, [the employee] must have solicited those clients").

Although U.S. Bank objects to any contact of U.S. Bank clients by Defendants, ECF No. 7 ¶ 23 (arguing there was "no legitimate business reason for Defendants to contact any of U.S. Bank's customers on or after April 15, 2025"), the weight of the case law supports Defendants' position that merely announcing their new positions with RBC does not demonstrate solicitation, *see Edward D. Jones & Co. v. Kerr*, 415 F. Supp. 3d 861, 873–74 (S.D. Ind. 2019) (observing that the majority of courts hold that an "announcement does

not qualify as a solicitation where there is no evidence to show that [the employee] did anything but inform his former clients of his new employment"); *Mobile Mini, Inc. v. Vevea*, No. 17-cv-1684 (JRT/KMM), 2017 WL 3172712, at *6 (D. Minn. July 25, 2017); *Christenson*, 2013 WL 2145703, at *5.[5]    U.S. Bank argues that while such "neutral announcements" have been blessed in cases involving parties regulated by the Financial Industry Regulatory Authority ("FINRA") or the Protocol for Broker Recruiting ("Broker Protocol"), this case does not involve FINRA or the Broker Protocol.  But the holdings in *Kerr* and *Christenson* did not turn on that distinction.  And courts considering cases outside of the FINRA or Broker Protocol context have come to the same conclusion as *Kerr* and *Christenson*.  *See Mariner Wealth Advisors, LLC v. Savvy Advisors, Inc.*, No. 1:24-cv-351, 2024 WL 3466153, at *8 (S.D. Ohio July 19, 2024); *Edelman Fin. Engines, LLC v. Butera*, Civil Action No. DKC 22-1388, 2022 WL 2176850, at *6 (D. Md. June 16, 2022); *Grimes & Co. v. Carlson*, No. 4:24-cv-11521-MRG, 2024 WL 5110193, at *6 (D. Mass. Dec. 12, 2024).

---

[5]    Because whether a particular communication constitutes "solicitation" is an incredibly fact-bound question that borders on the "metaphysical," *Kerr*, 415 F. Supp. 3d at 873 (citation omitted), the devil lies in the details.  A "neutral announcement" may subtly become a solicitation if, for example, the announcement includes the employee's new contact information, *see Choreo, LLC v. Lors*, No. 4:25-cv-00077 (SMR/SBJ), 2025 WL 973194, at *8 (S.D. Iowa Apr. 1, 2025), or even a warm closing to the effect of, "I look forward to continuing our relationship," *ARGI Fin. Grp., LLC v. Hardigg*, No. 3:20-cv-587-RGJ, 2020 WL 6930449, at *6 (W.D. Ky. Oct. 27, 2020); *see also UBS Fin. Servs. Inc. v. Fiore*, No. 17-cv-993 (VAB), 2017 WL 3167321, at *14 (D. Conn. July 24, 2017) (discussing the subtle ways that an announcement may become a solicitation).  However, U.S. Bank has not provided any details about Kirk's and Beumer's communications with U.S. Bank clients, except to state that the pair have "contacted" U.S. Bank clients.  Nothing in the record, therefore, contradicts Kirk's and Beumer's assertion that they have only provided a "neutral announcement" about their departure from U.S. Bank for RBC.

The Court recognizes that U.S. Bank is at an informational disadvantage in determining whether Kirk and Beumer solicited U.S. Bank clients.[6]  But at the end of the day, it is U.S. Bank's burden as the moving party to show its entitlement to injunctive relief. *See Bricker*, 103 F.4th at 1342.  Because U.S. Bank provides no evidence that Kirk and Beumer have crossed the line from a "neutral announcement" to solicitation, U.S. Bank has not demonstrated a fair chance of prevailing on its claim that Kirk and Beumer violated the CNS Agreement's non-solicitation provision.

###### b.    Whether U.S. Bank Has a Fair Chance of Prevailing on its Claim that Defendants Breached the Confidentiality Provision

At this juncture, U.S. Bank has not shown a fair chance of prevailing on its claim that Defendants breached the confidentiality provision of the CNS Agreement.  U.S. Bank first relies on a forensic analysis of Defendants' work computers, which shows that in the days leading up to Defendants' departure from U.S. Bank, Defendants accessed files and documents that contained U.S. Bank confidential information.  ECF Nos. 41, 42. Importantly, U.S. Bank has not uncovered evidence that Defendants downloaded any of this information, which would be highly indicative of Defendants breaching the confidentiality provision.  *See DraftKings Inc. v. Hermalyn*, 732 F. Supp. 3d 84, 117–18 (D. Mass. 2024).  Nor does U.S. Bank provide any evidence that Defendants emailed themselves any confidential information or otherwise accessed this information after their

---

[6]    In order to address U.S. Bank's request for injunctive relief on an expedited basis, the Court is limited in its review to the evidence in the record.  Nothing precludes U.S. Bank from renewing its motion for injunctive relief should the facts develop to support breaches of the confidentiality provision as to all Defendants and non-solicitation provision as to Kirk and Beumer.

departure from U.S. Bank, which would also be highly indicative of Defendants breaching the confidentiality provision. *See Material Handling Sys., Inc. v. Cabrera*, 572 F. Supp. 3d 375, 395 (W.D. Ky. 2021); *Prot. Techs., Inc. v. Ribler*, No. 3:17-cv-00144-LRH-WGC, 2017 WL 923912, at *2 (D. Nev. Mar. 8, 2017).

Instead, all U.S. Bank has shown is that U.S. Bank employees accessed U.S. Bank confidential information while working at U.S. Bank, which is "hardly noteworthy." *Fleetwood Packaging v. Hein*, No. 14 C 9670, 2014 WL 7146439, at *5–6 (N.D. Ill. Dec. 15, 2014); *see Silver Fern Chem., Inc. v. Lyons*, No. 2:23-cv-00775-TL, 2023 WL 3791824, at *4–5 (W.D. Wash. June 2, 2023); *Integro USA, Inc. v. Crain*, 19-cv-8752 (JPO), 2019 WL 6030100, at *3 (S.D.N.Y. Nov. 14, 2019). It is true that some of Defendants' file-access behavior is a bit suspicious, considering that they left U.S. Bank mere days later. But Defendants explain that they regularly accessed these documents as a normal part of their employment and as part of a project to transition the clients of a retiring advisor. *See* ECF No. 46. Although Defendants' explanation does not account for all of the files accessed in the waning days of Defendants' employment with U.S. Bank, given the conflicting evidence and the competing plausible explanations offered by Defendants, the Court does not believe that the forensic analysis offers sufficient evidence to nudge U.S. Bank's claim beyond speculation.

U.S. Bank's only other "evidence" of Defendants' violation is U.S. Bank's belief that Defendants must have taken and used confidential information if they were in contact with U.S. Bank clients. *See* ECF No. 7 ¶ 24. But U.S. Bank's hunch, standing alone, does not demonstrate a fair chance of prevailing on its claim. Chief Judge Patrick J. Schiltz

confronted an identical argument in *Wells Fargo Insurance Services USA, Inc. v. King*. In that case, just as here, a sales representative's confidentiality agreement with Wells Fargo defined "confidential information" to include "customer names" and "customer contact information." No. 15-cv-4378 (PJS/JJK), 2016 WL 299013, at *7 (D. Minn. Jan. 25, 2016). When the sales representative left Wells Fargo and contacted his former Wells Fargo clients, Wells Fargo argued that the sales representative "must have used confidential information because he has been in contact with [Wells Fargo's] customers." *Id.* Chief Judge Schiltz disagreed, finding that the "thin" evidence offered by Wells Fargo did not necessarily demonstrate that the sales representative had used Wells Fargo's confidential information to contact customers, as opposed to ascertaining the customer names and contact information through lawful means. *Id.* at *8.

The same can be said here. U.S. Bank's argument relies on speculation, and is countered by Defendants' assertion that they "d[id] not need any confidential or proprietary information of U.S. Bank" to contact their U.S. Bank clients, given that Defendants are close with their long-term clients, sometimes personally. ECF No. 36 ¶ 11; ECF No. 37 ¶ 11; ECF No. 38 ¶ 11. And to the extent that U.S. Bank argues that Defendants necessarily breached the confidentiality provision because they contacted U.S. Bank clients, the Court rejects that argument because it "cannot compel a [person] who changes employers to wipe clean the slate of [their] memory." *IKON Off. Sols., Inc. v. Am. Off. Prods., Inc.*, 178 F. Supp. 2d 1154, 1169 (D. Or. 2001) (collecting cases). That is all the more true in certain professions where work and personal boundaries blur. Here, U.S. Bank is unable to show a nexus between the files accessed by Defendants in the days leading up to their resignation

16

(including files containing home address, phone, and e-mail address information) and contact with any specific U.S. Bank client. In the absence of any evidence that Defendants actually have U.S. Bank's confidential information in their possession or used it to contact former U.S. Bank clients—particularly given Defendants' assertion that they deleted client contact information from their phones, ECF No. 36 ¶ 13; ECF No. 37 ¶ 13; ECF No. 38 ¶ 13—the Court denies the preliminary-injunction motion insofar as it seeks relief related to violations of the CNS Agreement's confidentiality provision.[7]

## II. Irreparable Harm

As for harm from Frederickson's solicitation, U.S. Bank has demonstrated a likelihood of irreparable harm absent injunctive relief. To show irreparable harm, "a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Dakotans for Health v. Noem*, 52 F.4th 381, 392 (8th Cir. 2022) (citation omitted). Irreparable harm occurs "when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009).

U.S. Bank argues that it will suffer irreparable harm through lost customer goodwill. ECF No. 6 at 25. Loss of customer goodwill can qualify as irreparable harm. *Iowa Utils. Bd. v. FCC*, 109 F.3d 418, 426 (8th Cir. 1996). But the risk of "harm to customer goodwill"

---

[7]     U.S. Bank also argues that disclosure of the investment portfolios of Kirk's clients—$1 billion in assets under management—in the online article violated the confidentiality provision of the CNS Agreement. ECF No. 6 at 24. But it is not clear from where that figure derives, leaving U.S. Bank to speculate that Kirk disclosed it. Moreover, even if Kirk had disclosed that figure, U.S. Bank has not demonstrated any harm resulting from what would be a relatively minor breach of the CNS Agreement's confidentiality provision.

stated in general, conclusory terms does "not show a likelihood of irreparable harm that, in turn, would justify issuing a preliminary injunction." *Midwest Sign & Screen Printing Supply Co. v. Dalpe*, 386 F. Supp. 3d 1037, 1055–56 (D. Minn. 2019).

U.S. Bank has provided more than general and conclusory assertions to support its claim of irreparable harm. The evidence of solicitation by Frederickson that U.S. Bank has uncovered satisfactorily demonstrates a likelihood that U.S. Bank stands to suffer a loss to customer goodwill. *See Vevea*, 2017 WL 3172712, at *6–7 (finding irreparable harm when an employee made "sales pitches" on social media for a new employer, in violation of non-solicitation agreement); *Esq. Search, Ltd. v. Dietrich*, No. 03-cv-5582 (ADM/AJB), 2003 WL 22663862, at *2 (D. Minn. Nov. 7, 2003) (finding irreparable harm when movant provided evidence of defendant's breaches of restrictive covenant). And that evidence distinguishes this case from other restrictive-covenants cases where irreparable harm was not found. *See Perficient, Inc. v. Craft*, No. 24-cv-2425 (PAM/DJM), 2024 WL 3356977, at *3 (D. Minn. July 10, 2024) (finding no irreparable harm because movant failed to identify any evidence of solicitation); *Core & Main, LP v. McCabe*, No. 21-cv-1512 (WMW/KMM), 2021 WL 3661503, at *4 (D. Minn. Aug. 18, 2021) (same).

The irreparable nature of U.S. Bank's harm is further supported by considering the types of clients that Defendants serve. Defendants operate in the private wealth management sphere, providing financial services to high-net-worth individuals. ECF No. 7 ¶ 11 (noting that "Defendants each worked primarily with PWM customers with a net worth of approximately $10 million to $75 million each"). U.S. Bank explains that working with high-net-worth individuals requires "develop[ment]" of "important

relationships" through "execution of [U.S. Bank's] strategic vision, including through substantial investments in building and fostering trust" so that U.S. Bank's employees can "help[] its customers build and preserve wealth and use it wisely." *Id.* ¶¶ 2, 4. Indeed, the fact that some clients have followed (or are considering following) Defendants to RBC is a testament to the importance of the relationship between a wealth advisor and her clients. *See id.* ¶¶ 21, 25; *see also* ECF No. 36 ¶ 14; ECF No. 37 ¶ 14; ECF No. 38 ¶ 14 (Defendants explaining the close, long-term relationship between them and their clients).

Irreparable harm is therefore more likely to be found when, as here, the customer relationships at issue require "substantial time, effort, and expense" to cultivate. *Bos. Sci. Corp. v. Duberg*, 754 F. Supp. 2d 1033, 1041 (D. Minn. 2010); *see Guidant Sales Corp. v. Baer*, No. 09-cv-358 (PJS/FLN), 2009 WL 490052, at *6 (D. Minn. Feb. 26, 2009). And the fact that Frederickson acknowledged in the CNS Agreement that U.S. Bank may enforce the CNS Agreement's provisions by seeking injunctive relief "bolsters a determination that irreparable harm will result from a breach of the [CNS] Agreement." *Nilfisk, Inc. v. Liss*, No. 17-cv-1902 (WMW/FLN), 2017 WL 7370059, at *6 (D. Minn. June 15, 2017) (citing *Life Time Fitness, Inc. v. DeCelles*, 854 F. Supp. 2d 690, 695 (D. Minn. 2012)); *see* ECF No. 1-1 at 20.

## III. Balance of Equities

The Court has already determined that U.S. Bank stands to suffer irreparable harm through the loss of customer goodwill. On the other side of the coin, although a preliminary injunction would impose some burden on Frederickson's ability to earn a living in the field in which she has acquired considerable expertise, that is a burden to which Frederickson

agreed by executing the CNS Agreement. *See Liss*, 2017 WL 7370059, at *6 (rejecting employee's argument that enforcement of noncompetition agreement would irreparably harm employee when the employee "voluntarily left [the movant's] employ fully aware that his future employment might be subject to the noncompetition provision"); *Vevea*, 2017 WL 3172712, at *7.

Moreover, the requested injunction does not entirely impede Frederickson from working in wealth management for RBC; all an injunction would do is prevent Frederickson from soliciting U.S. Bank's clients until April 15, 2026. On balance, the harm to U.S. Bank outweighs the harm to Frederickson.

## IV.    Public Interest

At bottom, "[t]his case implicates primarily business interests, not public rights." *Prime Therapeutics LLC v. Beatty*, 354 F. Supp. 3d 957, 975 (D. Minn. 2018). Nonetheless, courts recognize that the public interest favors judicial enforcement "of valid business agreements and the protection of legitimate business interests in an industry propelled by vigorous but fair competition." *Duberg*, 754 F. Supp. 2d at 1042 (citation omitted). Although restraints on competition are disfavored under Minnesota law, *see GreatAmerica Leasing Corp. v. Dolan*, No. 10-cv-4631 (JRT/JJK), 2011 WL 334829, at *3 (D. Minn. Jan. 31, 2011), Minnesota law permits use of nonsolicitation agreements to protect an employer's goodwill, *see* Minn. Stat. § 181.988, subd. 1(a).[8] This factor therefore weighs

---

[8]    In 2023, the Minnesota Legislature largely banned the use of covenants not to compete in employment agreements. *See* Minn. Stat. § 181.988. Nonetheless, the statute explicitly recognizes that an "agreement designed to protect trade secrets or confidential

slightly in U.S. Bank's favor.  Because all four factors for injunctive relief weigh in U.S. Bank's favor as to Frederickson's breach of the non-solicitation provision, the Court will grant a preliminary injunction against Frederickson only.[9]

## V.    Bond Under Fed. R. Civ. P. 65(c)

A court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  "Courts in this circuit have almost always required a bond before issuing a preliminary injunction," but a court may waive the bond requirement "where the defendant has not objected to the failure to require a bond or where the damages resulting from a wrongful issuance of an injunction have not been shown."  *Richland/Wilkin Joint Powers Auth.*, 826 F.3d at 1043.

---

information" or a "nonsolicitation agreement" are not prohibited by the statute.  *Id.*, subd. 1(a).  Defendants have not challenged the validity of the CNS Agreement.

[9]    In the event that the Court granted U.S. Bank's motion, Defendants submitted a competing proposed order that would specifically delineate the types of behavior that would or would not constitute solicitation.  ECF No. 40.  The Court declines the invitation. In this opinion, the Court has explained, to the extent necessary to decide the motion, its views on what type of conduct constitutes solicitation.  The Court need not say more, as that would verge on issuing an advisory opinion on hypothetical future conduct that may or may not constitute solicitation under the CNS Agreement.  *See Pub. Water Supply Dist. No. 8 v. City of Kearney*, 401 F.3d 930, 932 (8th Cir. 2005) (citation omitted) (internal quotation marks omitted) ("One kind of advisory opinion is an opinion advising what the law would be upon a hypothetical state of facts.").  The language of the injunction will therefore track the language of the CNS Agreement, which is what Frederickson agreed to with U.S. Bank.

U.S. Bank requests that the Court waive the posting of a bond.  *See* ECF No. 6 at

27–28.  Defendants have not opposed that request, so the Court will waive the bond

requirement.  *See Richland/Wilkin Joint Powers Auth.*, 826 F.3d at 1043.

## CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED** that:

1.  U.S. Bank's Motion for a Preliminary Injunction is **GRANTED IN PART** and

    **DENIED IN PART**.

2.  Until further order of the Court, or until April 15, 2026 (whichever is earlier),

    Defendant Darcy Frederickson is preliminarily enjoined from:

    a.  Contacting any of the customers of U.S. Bank for whom she directly

        performed any services or had any direct business contact for the purpose

        of soliciting business or inducing such customer to acquire any product

        or service that currently is provided or under development (to

        Frederickson's knowledge) by U.S. Bank from any entity other than U.S.

        Bank;

    b.  Contacting any of the customers or prospective customers of U.S. Bank

        whose identity or other customer specific information she discovered or

        gained access to as a result of her access to U.S. Bank's confidential

        information for the purpose of soliciting or inducing any of such

        customers or prospective customers to acquire any product or service that

currently is provided or under development (to Frederickson's knowledge) by U.S. Bank from any entity other than U.S. Bank; and

c. Utilizing U.S. Bank's confidential information to solicit, influence, or encourage any customers or prospective customers of U.S. Bank to divert or direct their business to her or any other person, association, or entity by or with whom she is employed, associated, engaged as agent, or otherwise affiliated.

Dated: June 6, 2025                          *s/Laura M. Provinzino*
                                             Laura M. Provinzino
                                             United States District Judge

23